**THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

REGINA KRYSTYN and ROBERT KYSTYN,
individually and on behalf of their minor child, Baby
I; TYEISHA JOHNSON and RICKY VIVRETE,
individually and on behalf of their minor child, Baby
E;

*Plaintiffs,*

      v.

UNIVERSITY OF CHICAGO MEDICAL CENTER,
an Illinois non-profit corporation;  DR. ANDREA
YARBROUGH, sued in her individual capacity; DR.
POJ LYSOUVAKON, sued in his individual capacity;
DR. ERIKA CHOING CLAUD, sued in her
individual capacity; DR. YI SHAO, sued in her
individual capacity; DR. JILL GLICK, sued in her
individual capacity; DR. MOHAMED TAHA, sued in
his individual capacity; ASHLEY DOWDY, a DCFS
Caseworker, sued in her individual capacity;
CYNTHIA CELESTINE, a DCFS Caseworker, sued
in her individual capacity; DEBBIE ROGERS, a
DCFS Caseworker, sued in her individual capacity;
RHOHDA RODGERS, a DCFS Casework, sued in
her individual capacity; and MARC D. SMITH, DCFS
Director, sued in his individual capacity,

*Defendants.*

## **COMPLAINT**

1.     Plaintiffs bring this action to protect their families' Constitutional right to be free

from state interference in the familial relationship, as well as their Constitutional right to be free

from illegal searches and seizures.

1

2. This case arises out of the births of two babies at the University of Chicago Medical Center ("UCMC"). UCMC has an express policy, procedures and/or alternatively *de facto* policies and procedures to notify DCFS to investigate parents for child abuse based simply on their refusal of a Vitamin K shot, a purely prophylactic medical procedure parents have the right to decline on behalf of their children. This policy was the result of former DCFS Director Walker and current Director Scott knowingly and/or recklessly implementing, authorizing, and/or directing or implementing an unconstitutional policy to consider the refusal of Vitamin K shots at birth to be per se "medical neglect," even though these policies conflict with both the United States Constitution and Illinois law.

3. At the time of these two incidents, Walker had rescinded this policy, yet Director Scott refused to take any action to ensure that his caseworkers and supervisors were trained to not investigate parents for medical neglect based on the mere refusal of such prophylactic medical treatments as the refusal of Vitamin K shots, and the refusal of antibiotics, which cannot meet the definition of "medical neglect."

4. Neither state nor federal law mandate medical professionals administer Vitamin K shots or antibiotics to babies at birth against the express wishes of the babies' parents, nor was it required by any demonstrable and/or urgent medical condition of the newborns in this case.

5. The parents had every right to refuse the medical procedures in question in this case.

6. The DCFS caseworkers who investigated the complaints of the hospitals' medical staff knew the reports of medical neglect were unfounded, not made in good faith, and were without legal or medical basis before the investigations even began, yet the caseworkers investigated the couples anyway, and, in fact, in each case, made baseless indicated findings,

2

which were later voluntarily unfounded by DCFS when the couples' attorneys pointed out the flaws in their investigations.

7.      The primary reason the Plaintiffs suffered these abuses – and upon information and belief these abuses continue to this day – is DCFS Procedures 300, Appendix B, Allegation of Harm #79 Medical Neglect, (b) Taking a Report, 2 Factors to be considered include: Section H (hereinafter referred to as "Section H").

8.      Section H is an express written DCFS policy that was once in place before the incidents in this case that declared that a parent's refusal of the Vitamin K shot *per se* "medical neglect."

9.      Although the Defendants represented to parents in Illinois, and the parents in this case in particular, that the Section H policy had the force of law in order to coerce parents, and these parents in particular, in actuality, Section H was always only an internal policy, and one that conflicted with Illinois law and the United States Constitution.

10.     Section H was originally adopted by high-ranking DCFS officials before the tenure of Walker and Smith, although they continued the policy regardless, knowing it was unconstitutional.

11.     For example, on August 2, 2018, DCFS's then-Acting Director B.J. Walker was forced to concede in a letter to DCFS staff and "stakeholders"—which would include the caseworker defendants in this case as well as the medical staff and doctors referred to in this case – that the Section H policy impermissibly defined what should be considered "medically necessary" for the purposes of determining whether parents committed medical neglect.

12.     Despite this admission, Walker continued to allow caseworkers under her supervision to investigate parents for "medical neglect" as part of a widespread de facto policy of

DCFS, based solely on their refusal of Vitamin K shots and/or the application of erythromycin eye ointment.

13.     In other words, Walker admitted in August of 2018 that the express policy she enforced – Section H – was without any legal basis and beyond her authority as acting Director, yet she continued to enforce the policy as an unwritten, de facto policy and practice, knowing it would continue to violate the Constitutional rights of parents such as the Plaintiffs in this case.

14.     Walker resigned on April 15, 2019, and Defendant Smith then took over enforcing this widespread *de facto* policy, despite Defendant Smith being aware of the express policy being rescinded by Walker after she publicly admitted in writing that DCFS has no legal authority to enforce such a policy.

15.     Despite Section H being rescinded on August 2, 2018, UCMC enforced an express and/or *de facto* unconstitutional policy and/or practice wherein the hospitals would report every parent who refused Vitamin K shots at their hospitals, despite DCFS's admission – sent to the hospitals at the time – that there was no legal basis to force parents to accept Vitamin K shots and that DCFS has no legal authority to investigate parents for these refusals.

16.     When the hospitals adopted and enforced these policies, the hospitals knew there was no legal basis to do so, yet the hospitals enforced these policies in an attempt to coerce parents into accepting medical procedures that the hospitals desired, but that the parents did not, even though these medical procedures were prophylactic and medically unnecessary.

17.     As part of their policies and/or practices, UCMC intentionally did not advertise or let parents know before the births that they had these policies in place, for fear of losing business.

18.     Additionally, UCMC took even more draconian measures.

19.     UCMC has an express policy that directs and/or encourages its hospital staff to coerce and threaten parents into accepting Vitamin K shots for every baby, even healthy ones, or face having the hospital take the babies into "protective custody" for the express purpose of administering the Vitamin K shots against the parents' desire and will.  This "protective custody" threat was used in this case by medical staff to take the Krystyn's baby into "protective custody" and forcibly administer a Vitamin K shot and antibiotics on their baby, against their express wishes, and this policy was also used in a coercive and threatening manner against the Johnson-Vivrete family.

20.     Even though this is an express policy developed by Defendant UCMC, the doctors named in this action have an independent obligation to not violate the Constitution and Illinois law, and in this case, the named doctor defendants violated both Illinois law and the Constitution.

21.     All of the Plaintiffs seek compensatory and punitive damages for the emotional trauma and mental anguish they suffered.

## JURISDICTION AND VENUE

22.     This Court has jurisdiction of the action pursuant to the Civil Rights Act, 42 U.S.C. §§ 1983 and 1988; 28 U.S.C. §§ 1331 and 1343(a), and the Constitution of the United States, as well as pendent jurisdiction for any state law claims.

23.     Venue is proper under 28 U.S.C. § 1391(b).  Upon information and belief, all Defendants reside in this judicial district, and the events giving rise to the claims asserted herein occurred within the District.

## THE PARTIES

### *Plaintiffs*

24.     Regina and Robert Krystyn are a married couple living in Chicago, Cook County, Illinois. They have one son, Baby I, who was born on October 5, 2020, at UCMC in Chicago, Illinois.

25.     Tyeisha Johnson and Ricky Vivrete are a married couple living in Chicago, Cook County, Illinois.  They have one son, Baby E, who was born on December 24, 2020, at UCMC in Chicago, Illinois.

### *Defendants*

26.     Defendant UCMC is an Illinois non-profit organization located in Chicago, Illinois. UCMC is being sued on a *Monell* theory of liability, as well as a *respondeat superior* theory of liability for the actions of Defendants Drs. Yarbrough, Lysouvakon, Choing Claud, Shao, Glick, and Taha.

27.     At all times, Defendant Dr. Andrea Yarbrough was acting under color of law and within the scope of her employment with UCMC.

28.     At all times, Defendant Dr. Poj Lysouvakan was acting under color of law and within the scope of his employment with UCMC.

29.     At all times, Defendant Dr. Erika Choing Claud was acting under color of law and within the scope of her employment with UCMC.

30.     At all times, Defendant Dr. Yi Shao was acting under color of law and within the scope of her employment with UCMC.

31.     At all times, Defendant Dr. Mohamed Taha was acting under color of law and within the scope of his employment with UCMC.

6

32.     At all times, in taking her actions in implementing and enforcing UCMC's Vitamin K/ "protective custody" policy, Defendant Dr. Jill Glick was acting under color of law and within the scope of her employment with UCMC.

33.     However, when being consulted in her role as a paid DCFS medical consultant during these two investigations, Dr. Jill Glick was acting under color of law in her role as a medical advisor paid by DCFS to consult with DCFS in medical neglect investigations.

34.     Defendant UCMC, through its implementation of its unconstitutional Vitamin K/ "protective custody" policy, was acting under color of law at all times in taking the actions described in this complaint.

35.     The express Vitamin K/ "protective custody" policy described in this complaint was the "moving force" and proximate cause of the injuries suffered by the Plaintiffs.

36.     Defendant Ashley Dowdy is a DCFS caseworker who was acting under color of law and within the scope of her employment with DCFS at all times relevant to this complaint.

37.     Defendant Cynthia Celestine is a DCFS caseworker who was acting under color of law and within the scope of her employment with DCFS at all times relevant to this complaint. She is also being sued in her supervisory role.

38.     Defendant Debbie Rogers is a DCFS caseworker who was acting under color of law and within the scope of her employment with DCFS at all times relevant to this complaint.

39.     Defendant Rhonda Rodgers is a DCFS caseworker who was acting under color of law and within the scope of her employment with DCFS at all times relevant to this complaint. She is also being sued in her supervisory role.

40.     Defendant Marc D. Smith is the current Director of DCFS.  He is being sued in his individual capacity.  He was acting under color of law at all times and within the course and scope of his employment with DCFS.    He is also being sued in his supervisory role.

41.     Defendant Smith is being sued in his individual and supervisory capacities for his deliberate indifference, tuning a blind eye, and in his proximately causing the Constitutional violations at issue in this case.

## STATEMENT OF FACTS

**A.      Baby I's Birth and DCFS Investigation**

42.     Regina and Robert Krysyn are a married couple living in Chicago, Cook County, Illinois. They have one son, Baby I, who was born on October 5, 2020, at UCMC in Chicago, Illinois.

43.     Baby I was born generally healthy, and although at 34 weeks and 4 days, he was considered premature and had some respiratory issues, he was otherwise healthy and born at a healthy weight of 6 pounds, one ounce.

44.     The couple arrived at UCMC, and once it was confirmed that the baby was ready to be delivered, then the couple provided medical staff with a written birth plan, which indicated they wanted a natural birth, without, for example, the administration of a Vitamin K shot or any antibiotics.

45.     This was a thoughtful decision made by the couple after doing medical research and speaking with medical professionals, such as doulas and midwives, who confirmed that Vitamin K shots at birth and antibiotics at birth are medically unnecessary, purely prophylactic, and can carry some medical risks for babies.

46. Before the birth, the couple indicated to UCMC staff at the hospital that they did not want certain medications or procedures, including the use of antibiotics and a Vitamin K shot, which were purely prophylactic in nature.

47. Before the birth, the UCMC medical staff pushed back on this request, and tried to convince the couple to accept these unwanted medical procedures. The couple, however, reiterated they did not want these medical procedures for their baby.

48. As the labor progressed, Robert had several conversations with UCMC medical staff about their medical choice to refuse the Vitamin K shot, and also antibiotics, and these staff members, including Dr. Yarbrough and Dr. Choing, told them that, per UCMC policy, the refusals of Vitamin K and antibiotics would result in calling DCFS, taking their baby into protective custody, and administering the Vitamin K shot and the antibiotics against their will.

49. Robert attempted to prevent this from happening by calling 911 before the birth, however, the UCMC police arrived, and sided with the UCMC medical personnel, and refused to intervene.

50. UCMC medical staff, including Drs. Yarbrough and Choing, made the decision to take "protective custody" of Baby I even before he was born.

51. Upon information and belief, according to the DCFS file obtained in this case, it appears that Dr. Shao was part of the medical team present at the hospital that was part of the decision to threaten the Krystyn family with taking their baby into "protective custody" then actually doing so and forcibly administering medical treatment on their baby, against their express wishes, although the Plaintiff does not remember having any specific interaction with this doctor.

52. Meanwhile, Robert called 911 again to request the Chicago police intervene, however, by the time they arrived, Baby I was born, and UCMC had already taken "protective

custody" of Baby I, which meant they made the decision to administer the Vitamin K shot and antibiotics against the express wishes of Regina and Robert.

53.     When UCMC medical staff took "protective custody" of Baby I, for the next 48 hours UCMC usurped the Constitutional right of the Plaintiffs to make medical decisions for their baby.

54.     The taking of Baby I into "protective custody" took place before Baby I was even born.

55.     The couple made this conscious choice to decline this medical treatment because they knew these treatments were only prophylactic, carried with them certain risks and deleterious health effects for the baby, and at no time were they told by any UCMC medical staff that their child was in imminent danger if these treatments were refused.

56.     Instead, the medical staff described these treatment as recommendations only, and required by UCMC policy.

57.     While the couple was still at the hospital, a DCFS case worker, Ashley Dowdy, arrived to conduct an interview.

58.     During this interview with the couple, they confirmed that it was their informed choice to decline a Vitamin K shot and antibiotics for Baby I, and that at no time did any medical staff inform them that those treatments were life-saving measures, but that instead it was just explained to them that these were recommended treatments and prophylactic in nature.

59.     This is true because these unwanted medical treatments were not medically necessary and were only prophylactic in nature.

60.     The couple told Dowdy that, had they been told or believed that these medical treatments were life-saving then, of course, they would not have refused those for their child.

10

61.     These treatments were not life saving and were not needed to prevent imminent serious harm to their baby, but were only prophylactic in nature.

62.      Dowdy also told the couple during this conversation that there would be a DCFS investigation, and that they were required to do a "home visit" as part of this investigation.

63.     Ashley told the couple that this "home visit" was mandatory, and that the couple would be required to allow her into their home, and they had no choice in the matter.

64.     On October 8, 2020, Dowdy spoke with Dr. Shao in person.  During this conversation, Dowdy grilled Dr. Shao about any specific medical condition that Baby I had that would have necessitated immediately, life-saving treatment, and Dr. Shao could point to none, only indicating that it was "possible" that this could have occurred, and that the Vitamin K shot and antibiotics were their "standard" recommended treatment.

65.     Dowdy knew based on this conversation with Dr. Shao that these allegations would not meet the definition of "medical neglect," and asked Dr. Shao whether she believed the parents are "guilty of medical neglect," a determination of guilt that Dowdy – not Dr. Shao – should be making, and Dr. Shao answered "yes."

66.     The next day, October 9, 2020, Dowdy had an email exchange with Dr. Glick.

67.     Dowdy consulted Dr. Glick per DCFS protocol to advise with a doctor affiliated with the MPEEC, an organization that, upon information and belief, is paid by DCFS to serve as advisors in medical neglect cases.

68.     Dr. Glick was the medical director of MPEEC.

69.     Dr. Glick also was the medical director of UCMC's Child Advocacy and Protective Services.

70.     Dr. Glick was also the same physician who has advocated for years with DCFS that DCFS mandate that all physicians take babies into "protective custody" whenever their parents refuse a Vitamin K shot, regardless of the particular circumstances of the case.

71.     Dr. Glick also was critical in developing and implementing UCMC's policy of mandating that physicians at UCMC take children into "protective custody" whenever parents refuse Vitamin K shots, regardless of the particular circumstances of the case.

72.     And, of course, this is the same Dr. Glick that served on the Advisory Board at DCFS, and who played a critical role in drafting Procedures 300.

73.     In her October 9, 2020 email to Dowdy, Dr. Glick responded to Dowdy's inquiry whether the facts of this case rose to the level of medical neglect.  In response, Dr. Glick wrote: "refusal by parent is not in the best interest of the child and no treatment would be medical malpractice.  Hence the doctor was obligated to treat a sick premature baby.  This baby was premature with respiratory distress and antibiotic treatment and Vitamin K are absolutely indicated.  Premature babies who are ill or if the NICU MD in her or her (sic) capacity state antibiotics are warranted and the risk of bleeding is higher in premies both medications are not under the category of choice by parents."

74.     On October 17, 2020, Dr. Glick had another phone conversation with a DCFS case worker, Cynthia Celestine, who documented this conversation in the Krystyn file reviewed by Dowdy. Dr. Glick indicated that she reviewed the MPEEC form and in her opinion this was considered "medical neglect" because if the two medications were not administered "the child may have died" and that this would have resulted in a medical malpractice lawsuit.

75.     When Dr. Glick was consulted, she knew the very high bar that must be met to meet the specific ANCARA definition of medical neglect, and that the refusal of these prophylactic

12

medications did not even closely meet the definition, that there was nothing about the child's specific condition that would have made these medications medically necessary to prevent imminent, serious harm to the child. Dr. Glick was making her opinion based on her generalized belief that all babies should receive Vitamin K shots at birth to reduce the risk of death in the unlikely event of a brain bleed, not based on the necessity that a Vitamin K shot or antibiotics were urgently needed to address a serious, imminent, specific, medical condition, which she knew is required for a finding of medical neglect under ANCARA.

76.     On November 23, 2014, Dowdy conducted a mandatory "home visit" of the Plaintiffs' home.

77.     This "home visit" was done with a warrant, without consent, and without "exigent circumstances."

78.     Celestine knew Dowdy was going to do this illegal search of the Plaintiffs' home, and Marc Smith knew that it was DCFS policy to mandate non-consensual, warrantless home visits in all DCFS investigations, regardless of whether exigent circumstances, and he further knew these illegal home visits were done in all medical neglect cases, and specifically Vitamin K refusal cases such as the one at bar, and yet he allowed the unconstitutional practice to proceed anyway.

79.     During the home visit, Dowdy indicated to the couple that both she and her supervisor, apparently referencing Cynthia Celestine, did not want to make an indicated finding, but that DCFS felt pressured by the medical doctors she was consulting to make the finding, an apparent reference to Drs. Shao and Glick.

80.     Dowdy and her supervisor, Celestine, knew from their investigation that there was no probable cause to believe that Regina and Robert were guilty of medical neglect, despite being given that unsubstantiated legal conclusion by Drs. Shao and Glick, and yet they went along with

13

the decision to indicate Regina and Robert for medical neglect anyway, succumbing to the pressures of Dr. Shao, and especially Dr. Glick, whose multi-faceted role in DCFS medical neglect investigations makes it near impossible, politically, to ever disregard her conclusory, biased, conflicted, and unsubstantiated conclusions of "medical neglect."

81.     Dowdy was apologetic, and implicitly conceded Regina and Robert were not guilty of medical neglect, and thus advised the couple, not just that they have the right to appeal her decision, but that they *should* appeal this decision.

82.     The couple was forced to hire and pay an attorney to appeal this administrative finding.

83.     Months later, some time after their attorney wrote DCFS senior litigation attorneys a letter in July of 2021 outlining the numerous flaws in the investigation and that fact that the allegations do not even closely meet the definition of "medical neglect," but instead were based on doctor recommendations and standards of care, DCFS voluntarily unfounded the indicated finding, in a manner not inconsistent with the innocence of Regina and Robert.

84.     As a result of an illegal and unconstitutional investigation and illegal and unconstitutional entry into their home, the Plaintiffs suffered damages, including the right to have an intact family free from Government interference and free from illegal searches and seizures, causing severe emotional damages.

**B.        Baby E's Birth and DCFS Investigation**

85.     Tyeisha Johnson and Ricky Vivrette are a married couple living in Chicago, Cook County, Illinois.  They have one daughter, Baby E, who was born on December 24, 2020, at UCMC in Chicago, Illinois.

86.     On December 24, 2020, Tyeisha gave birth to a healthy baby girl, Baby E, at UCMC in Chicago, Illinois.

87.     Shortly after the birth, Dr. Poj Lysouvakon and other medical personnel came into the couple's hospital room, and tried to convince the couple to have a Vitamin K shot for their baby.

88.     The couple indicated they would decline this treatment, and refused to allow the medical personnel to administer the shot to Baby E.

89.     The couple explained their reasoning to medical personnel, which included a religious basis for the refusal.

90.     After multiple attempts to coerce the couple into accepting the Vitamin K shots against their express wishes, Dr. Lysouvakon and other UCMC medical staff requested that the couple sign a medical waiver reflecting their refusal to accept the Vitamin K shot.

91.     The couple looked at the pre-printed UCMC waiver that was presented to them, and had issues with the language in that waiver, and indicated they did not want to sign this form.

92.     As a result of the couple indicating they did not want to sign the waiver, Dr. Lysouvakon and other UCMC medical staff threatened the couple that if the couple did not sign the waiver, DCFS would come to the hospital and take custody of their baby, however, if they signed the waiver, then there would simply be an investigation.

93.     Additionally, in a separate conversation, Dr. Mohamed Taha told the couple that they could not leave the hospital with their baby unless they signed the waiver.

94.     As a result of the threats made by Dr. Lysouvakon, Dr. Taha and other UCMC medical staff, the couple signed the waiver, and then were allowed to leave the hospital.

15

95.     Caseworker Debbie Rogers investigated this case, and as part of this investigation, she spoke with UCMC doctors, although the Plaintiff is not in possession of an unredacted file that would reveal these names and what these individuals said to the case workers.

96.     As part of this investigation, Rogers consulted with Dr. Glick, but it is not clear what she told Rogers.

97.     In the following days and weeks, DCFS case workers, including Debbie Rogers, and her supervisor, Rhonda Rodgers, repeatedly harassed, bullied, and threatened Tyeisha and Ricky into allowing a DCFS worker into their home for a mandatory "home visit."

98.     Rogers and Rodgers knew they did not have a warrant, consent, or exigent circumstances for such a mandatory "home visit," yet they insisted on it anyway, and they both indicated to Tyeisha and Ricky that they would be indicated for child abuse if they did not relent. In fact, Rodgers, the supervisor, threatened the couple that DCFS would take away their child, forcibly, with the assistance of law enforcement, if they did not allow the home visit.

99.     At one point, coerced and bullied into having their Constitutional rights violated, the couple offered a compromise, *i.e.* to allow a DCFS official to see the baby over Zoom, however, DCFS rejected this proposal, and insisted the only other proposal would be for the couple to take the baby to a DCFS facility to observe their baby.

100.     However, this was in February of 2021, the days of raging COVID, and the couple knew that this would put their baby in danger or being exposed to COVID, and thus refused this option.

101.     Soon thereafter, Rogers and Rodgers indicated the couple for medical neglect, not based on their refusal of the Vitamin K shot, but explicitly because they refused the "home visit," a blatantly unconstitutional reason to indicate someone for medical neglect.

16

102.     Eventually, some time after their attorney wrote DCFS senior litigation attorneys an email outlining the numerous flaws in the investigation and that fact that the allegations do not even closely meet the definition of "medical neglect," DCFS voluntarily unfounded the indicated finding.

103.     On September 28, 2021, DCFS voluntarily unfounded the indicated finding, in a manner not inconsistent with the innocence of Tyeisha and Ricky.

104.     As a result of an illegal and unconstitutional investigation and illegal and unconstitutional entry into their home, the Plaintiffs suffered damages, including the right to have an intact family free from Government interference and free from illegal searches and seizures, causing severe emotional damages.

**C.     The DCFS and UCMC Vitamin K and Erythromycin Policies**

1.     *The Initial 2015 Policy*

105.     In 2015, DCFS established an express written policy for investigating parents or guardians who chose to refuse the Vitamin K shot and/or the erythromycin eye ointment for their newborn baby, directing DCFS staff that these medical procedures are to be considered *per se* "medically necessary" and to investigate reports of parental refusal as "medical neglect."

106.     This policy (the "Policy" or "Section H") could be found in Procedures 300, App. B, Alleg. 79(b)(2) Section H, which stated:

> For purposes of child protection services, the administration of silver nitrate or ophthalmic solution and Vitamin K shots or pills to newborns is considered medically necessary.  Calls received at SCR concerning a parent or guardian denying consent for the administration of these treatments shall be taken as reports of medical neglect.
>
> **Note**: [Bold in Original].

17

> If a physician notifies SCR[1] that temporary protective custody has been taken because the parent/caregiver's religious beliefs do not permit them to consent to necessary medical car, such information must be transmitted by the physician to the local State's Attorney's Office. No investigation will be taken unless there is additional information supporting other allegations of abuse or neglect. *Id.*

107.    Section H was intended as part of a larger procedural guide for DCFS employees, not physicians or doctors, directing DCFS employees how to manage and investigate accusations of child abuse and neglect, and was not intended to modify existing ANCRA law, which would need to proceed through the legislative process, which it was not.

108.    In 2015 and 2016, and into the early part of 2017, this internal policy became known to pediatricians in Illinois, and caused confusion among pediatricians as to whether they should, can or were required to report refusals of Vitamin K and erythromycin as "medical neglect."

##     2.     *The PAC Pushes Back*

109.    In early 2017, some members of the Perinatal Advisory Committee of the Illinois Department of Public Health ("PAC"), a government body, and other Illinois pediatricians were concerned about Section H, and desired further explanations and/or discussions with DCFS. These PAC members and other Illinois pediatricians were troubled because prior to the development of this internal 2015 DCFS policy, parents or guardians who refused erythromycin eye ointment when there was no risk of eye-sight-threatening infection, or the Vitamin K shots for their healthy newborn babies, simply signed an informed-consent refusal form and were allowed to choose to deny the administration of such prophylactic and medically unnecessary procedures.

---

[1] The SCR is the State Central Registry, the intake department of DCFS.

110.    Furthermore, these PAC members and other Illinois pediatricians also were concerned whether Section H would require all Illinois pediatricians, doctors, and other medical staff, as "mandated reporters" of child abuse under Illinois law, to report the Vitamin K shot refusal or erythromycin eye ointment refusal as "medical neglect," regardless of the particular circumstances of the case or the medical personnel's own medical opinion about the necessity or risks and benefits of such procedures.

111.    By May 2017, the chairman of the PAC, Dr. Beau Batton, requested a meeting with DCFS officials on this specific issue to address inconsistencies in how hospitals across Illinois were responding when parents refused these prophylactic procedures.

112.    In June 2017, DCFS's then-Medical Director, Dr. Paula Jaudes, who is now deceased, and Nora Harms-Pavelski, then-Deputy Director of Child Protection for DCFS, spoke at the PAC meeting.

113.    Dr. Jaudes was DCFS's medical director, but she was also simultaneously a board member of the Illinois Chapter of the American Academy of Pediatrician's Committee on Child Abuse and Neglect ("COCAN"), a committee of a private group of pediatricians, and she was also employed by UCMC as a professor of pediatrics.

114.    Dr. Jaudes and Harms-Pavelski told to the PAC members that, after consulting with DCFS's legal department and the DCFS administration, that DCFS had decided that a Vitamin K shot refusal was *not* to be considered *per se* medical neglect, and was not to be considered a mandated call to DCFS, and that, further, if doctors or medical staff were to make a call to DCFS based solely on a parent refusal of those medical procedures, then there would be no DCFS investigation conducted.

3.    *Hospitals and Pediatricians Push For Reinstatement of Section H*

115.    High-ranking DCFS officials, including Dr. Jill Glick, a UCMC pediatrician who also served on the DCFS Advisory Board, worked in concert with certain pediatricians to jointly engage with these high-ranking DCFS officials to reverse that decision and enforce the Section H policy so that a parent's refusal of a Vitamin K shot or the application of erythromycin eye ointment would be taken as a report of *per se* "medical neglect" in every case and investigated by DCFS as such.

116.    High-ranking DCFS officials, including Walker and Harms-Pavelski and non- Dr. Jaudes and Dr. Glick, from their previous examination of this issue, including the consultation of DCFS's legal team and Illinois neonatologists, knew that there was no basis to conclude that parents who refuse Vitamin K shots for their newborn babies were committing "medical neglect" solely as a result of that refusal.  Yet, these officials decided to act and work in concert with certain Illinois pediatricians to circulate and enforced Section H's *per se* policy.

117.    On August 8, 2017, in preparation for an August 9, 2017 COCAN meeting attended by pediatricians and hospitals representatives, including pediatricians employed by UCMC, an ICAAP staff member, Elise Groenewegen, circulated an email to dozens of medical professionals, including UCMC employees Dr. Glick, Dr. Jaudes and two other pediatricians, which highlighted the Vitamin K portion of the proposed policy, including the "Note."  The Section H policy defined the refusal of Vitamin K shot as *per se* medical neglect, and once again, the "Note" stated:

> If a physician notifies SCR that temporary protective custody has been taken because the parent/caregiver's religious beliefs do not permit them to consent to necessary medical car, such information must be transmitted by the physician to the local State's Attorney's Office.  No investigation will be taken unless there is additional information supporting other allegations of abuse or neglect.  *Id.*

118.    Prior to DCFS advancing the Section H policy to pediatricians and hospital staff in the Fall of 2017, this Note would have been directed at DCFS employees.  However, this Note

20

now appeared to be encouraging, authorizing, and/or assuming that physicians would take babies into protective custody.

119.    Dr. Jaudes was on this email, which was directed to her UCMC email address, and on that same date, Dr. Jaudes forwarded this email to herself, and her DCFS email address.

120.    Dr. Jaudes attended this meeting.  Upon information and belief, during this meeting, Dr. Glick and other pediatricians encouraged Dr. Jaudes to convince DCFS to reverse course and make Section H the official policy of DCFS, including the authorization of taking babies into protective custody to forcibly administer the Vitamin K shot.

121.    In doing this, Dr. Jaudes, acting in her tripartite role as the DCFS medical Director, COCAN Board Member, and UCMC Professor of Pediatrics, and Dr. Glick, a member of the DCFS Advisory Board and a UCMC pediatrician, gave their tacit and/or express permission and/or encouragement for UCMC to develop and implement its "protective custody" policy.

122.    Shortly after this meeting, Dr. Glick worked with other UCMC pediatricians to develop its "protective custody" policy.

123.    Dr. Glick explained in an August 10, 2017 email to Harms-Pavelski, and others, including Dr. Jaudes, that the impetus for writing the UCMC protocol was "DCFS recognizing [Vitamin K refusal] as child medical neglect."

124.    Convinced to change its position by Dr. Glick, among others, DCFS officials, including Defendant Harms-Pavelski, then sent an email to the pediatricians and hospitals, in October 2017 that stated, once again, Section H was to be enforced and asking all hospitals to report refusal of Vitamin K as medical neglect.

125.    On October 24, 2017, DCFS officials began to notify pediatricians and hospitals to report such refusals as medical neglect.

126. The doctors and hospitals, including the three Hospitals in this case, agreed to respond to parent refusals of these prophylactic medical procedures at issue herein as *per se* "medical neglect" to justify and initiate DCFS investigations.

127. Neither the internal policy first developed in 2015 nor the October 24, 2017 directive from DCFS to the pediatricians and hospitals complied with the legally-mandated safeguards of the Illinois Administrative Procedures Act, which includes but is not limited to following the Joint Committee on Administrative Rules process, public notice, and public hearings.

128. Walker became aware of the Directive in November of 2017, and officially adopted Section H and the Directive as the official policy of DCFS, although ones not subject to the normal administrative-rule-making process, as described above.

129. When Walker took this action in implementing this largely secret policy, she knew this was a policy that violated Illinois law, and the United States Constitution.

130. As with the previous Section H policy, the high-ranking DCFS officials chose not to vet this policy through the legally-mandated rule-making process in Illinois.

131. Emboldened by the DCFS October 24, 2017 Directive, hospitals, including the three hospitals in this case, began to have their medical staff aggressively coerce and threaten parents who refused Vitamin K shots and eye ointment for their newborns with DCFS investigations.

132. Walker, meanwhile, knew the Illinois pediatricians and hospital employees were invoking the power and authority of a DCFS investigation against parents to threaten and coerce parents who refused the Vitamin K shot and eye ointment – in violation of Illinois law and the parents' constitutional rights to family integrity – and yet she allowed this practice to continue anyway.

133.     Furthermore, Walker was aware or should have been aware that UCMC created its own policy for coercing or forcing the administration of Vitamin K shots on babies against the express wishes of their parents by threating or actually taking babies into "protective custody," so as to force these unwanted medical procedures on the parents, and Walker knew these policies were illegal and unconstitutional.  Yet, Walker did nothing to prevent his from occurring, even after she rescinded the policy in 2018.

134.     These individual hospital policies, such as the policies developed and employed at UCMC, were developed for internal use and generally were not made available to the public or put on the hospital websites.  The result of this lack of transparency was that parents could not make informed choices as to which hospitals had these policies, so as to avoid having to endure an invasive, traumatic, and lengthy DCFS investigation for refusing Vitamin K shots, or having their children taken into "protective custody" and having the medical procedures forcibly administered.

135.     UCMC was confident that it could enforce its "protective custody" policy because it made sure that it had the official approval DCFS.  For example, at an April 12, 2018 PAC meeting, two important topics were discussed among the pediatrician Board members, at least one of whom was a UCMC pediatrician.   First, a doctor who upon information and belief is a UCMC pediatrician and PAC Board Member, explained that uniformity in Vitamin K policies, as well as secrecy, among hospitals was required because the pediatricians did not want patients to be able to transfer hospitals once they found out that their babies would be taken into protective custody for refusing Vitamin K shots.  Second, this same UCMC pediatrician, in response to an inquiry from one pediatrician at the meeting whether they could be sued for doing this, responded "no," they could not, "because you have their . . . you took protective custody.  That's the part . . . That's the part that we have to assure with DCFS.  That when we do this… DCFS has to say, 'This is our

protocol, no matter what else we do: You are protected.'". This same UCMC pediatrician also explained that protective custody was solely a method of forcing the Vitamin K shot on the babies without their parents' consent, and that she did not care whether there was a follow-up DCFS investigation to determine whether the parents were unfit, nor did he care to know their reasons for declining the shots. Dr. Andrews said, "Protective custody is just the right to do what you think is right for the baby. And, DCFS, if they say, 'yes, that we agree with you, cause this is our rule'. You give the Vitamin K and then do any of us really care what happens next?"

136. Similar to most other Illinois hospitals, at least two of the three Hospitals in this case had pre-printed refusal forms available for parents who refused Vitamin K and erythromycin.

137. The existence of refusal forms demonstrates that refusals of these medical procedures was, and is, not considered "medical neglect" by a reasonable physician on a per se basis.

138. Every Defendant in this case knew that the refusal of prophylactic Vitamin K shots and erythromycin eye ointment was not "medical neglect" as defined by Illinois law.

139. Hundreds of Illinois families were threatened with being reported to DCFS for medical neglect simply because the parents refused erythromycin eye ointment or prophylactic Vitamin K shots for their newborn babies. These threats occurred within hours of their babies' births and at a time when families are particularly vulnerable. These families felt coerced or forced to accept the procedures they had refused. Many of these families were ultimately reported to DCFS and faced a DCFS investigation solely on the grounds of their refusal. Almost all of those investigations were dismissed as unfounded, nearly all of them also resulted in illegal searches and seizures of their homes.

4. *The Rescission of Procedure 300, App. B, Alleg. 79(b)(2)(H)*

140. In May of 2018, James F. Holderman III, a parent who, along with his wife, was subjected to threats and an unfounded DCFS investigation of medical neglect based on the their

24

medical choices for their newborn, began networking with other parents in Illinois who were subjected to similar treatment or shared James' concerns.

141.    James became aware of DCFS's Section H policy that considered refusal of the Vitamin K shot and erythromycin eye ointment as *per se* "medical neglect," ostensibly warranting DCFS intervention and/or investigation, and of the widespread practice among pediatricians and hospitals of using Section H to threaten parents with DCFS intervention.  He and other parents confronted PAC members and DCFS in June and July 2018 about these policies and the policies' enforcement.

142.    On July 23, 2018, Bruce Dubre, an official with DCFS's Office of Children and Family Policy, sent an email in response an inquiry from to Elaine M. Spencer, Rules Analyst for the Joint Committee on Administrative Rules, "JCAR", in the Illinois General Assembly. Mr. Dubre wrote:

> DCFS does not take reports of medical neglect for a parent refusing to have their child vaccinated; however, until recently we have accepted reports of parents who refuse to have their newborn treated with silver nitrate eye drops and vitamin K shots.  Both of these treatments must be administered within the first 24 hours of life or they no longer have efficacy.  The reason DCFS took these situations as the basis for medical neglect is due to the Infant Eye Disease Act [410 ILCS 215/3] requiring the application of the silver nitrate solution and because vitamin K shots are required via Title 77 Section 250.1830.  Both of the rule and law apply to nursing staff and are not in ANCRA.  As there is no mention of these procedures in Rule 300, we have issued an Action Transmittal immediately revoking the Department's policy of using a parent's failure to approve of either treatment as a basis for an allegation of medical neglect.

143.    Walker sent an August 2, 2018 letter to "DCFS staff and stakeholders" stated that, effective immediately, DCFS would no longer consider the refusal by parents or guardians to allow

doctors to administer Vitamin K shots or erythromycin eye ointment to newborn babies to be *per se* medical neglect. Walker wrote:

> In effect since 2015, this procedure inappropriately identifies what can and should be considered 'medically necessary.' Making that kind of determination falls outside the confines of our statutory and professional mission and judgement.

144.     This letter was distributed to "DCFS staff and stakeholders," which would include the three Hospitals in this case, and also this letter was easily searchable on the Internet.

145.     Even though Section H has been rescinded, the practices described above regarding *per se* medical neglect reporting to DCFS for refusal of newborn medical procedures continued nevertheless in a systematic manner, transitioning from an express, written policy to a *de facto*, unwritten one, and Walker knew this was occurring, despite the issuance of her letter.

146.     Smith similarly knew that this policy was rescinded in 2018, but that hospitals and pediatricians, including those at the three hospitals in this case, were continuing to enforce Section H as if it had never been rescinded, and furthermore Smith and Walker both knew that UCMC continued to enforce a policy that all refusals of Vitamin K or erythromycin would result in physicians first threatening, then actually taking, babies into "protective custody," even though they knew there was no basis for doing so, either under Illinois law or the United States Constitution, and not even Section H, which had since been rescinded.

147.     Walker was aware that hospitals, doctors, and medical personnel were continuing to call DCFS for investigation of parental refusals of prophylactic Vitamin K shots and other newborn medical procedures. She was also aware that DCFS caseworkers were continuing to open investigations for medical neglect as a result of such calls, and that there was no legal basis to do so.

148.     On April 15, 2019, Defendant Smith replaced Walker as the new DCFS Director.

149.     Smith quickly learned that DCFS was enforcing the former Section H as an unwritten policy and widespread practice, and yet he did nothing to prevent this illegal practice from continuing, even though he knew Walker publicly admitted in August of 2018 that DCFS had no authority to conduct such investigations.

150.     Smith also took insufficient action to ensure that hospitals, doctors, medical personnel, and DCFS caseworkers knew that the *per se* medical neglect policy had been rescinded and would not be enforced by DCFS, and that specifically such allegations should not be pursued on a per se basis, but should only be investigated if the specific facts of a case rose to the level of "medical neglect," as that is defined by Illinois law.

D.     **Mandated "Home Visits"**

151.     Smith has been aware since becoming Director that DCFS had a well-established express and/or de facto policy and/or practice of requiring home visits for all DCFS investigations of "medical neglect" even though this policy is inconsistent with Fourth Amendment principles because these so-called "home visits" are in reality warrantless searches done on a *per se* basis without any exigent circumstances, without care to the individual circumstances of a particular case, and done without the parents' valid consent, yet these Defendants continued to enforce and allow this practice or procedure to occur, the proximate cause of which was the Defendant case workers in this case conducting illegal searches and seizures of the homes of the Plaintiffs.

E.     **The Refused Medical Procedures and Their Risks**

1.     ***IM Vitamin K Shot***

152.     The intramuscular or IM Vitamin K shot is a prophylactic injection of a synthetic form of Vitamin K given to newborns.  The goal of administering this injection is to prevent Vitamin K Deficiency Bleeding ("VKDB"), a serious but rare medical condition.

153.     VKDB may develop immediately after birth or up to 12 weeks after birth.  Infants with risk factors for developing VKDB include those with certain genetic or hereditary conditions or diseases, liver diseases, maternal intake of blood-thinning drugs, poor or delayed feeding, or immediate cord clamping/cutting.

154.     Reported rates of VDKB necessarily include newborns and babies with increased risk factors, and range from 1 in 4,000 to 1 in 8,000.  Healthy babies without any risk factors, such as the babies in this case, are at significantly less risk than those numbers of being one of the babies to spontaneously develop VKDB.

155.     None of the Plaintiffs' newborn babies had any of these risk factors at birth, and they all remain healthy, happy children to this day.

156.     On the other hand, there are significant safety concerns and risks associated with having certain formulations of the Vitamin K shot injected into a baby, including from chemicals that weaken the blood-brain barrier or cause fatal gasping syndrome. Vitamin K injections come with a "black box" warning that includes the risk of death.

157.     Important to the Krystyn case, the Food and Drug Administration has indicated, "The newborn normally has low levels of vitamin K-dependent clotting factors. These may be further depressed and accompanied by hemorrhagic manifestations in rare cases. Vitamin K, given prophylactically to the mother or to the afflicted infant, will probably reverse this abnormality. It should be noted, however, that most hemorrhagic disease in the newborn is not a result of vitamin K deficiency. The use of watersoluble or synthetic vitamin K derivatives has been reported to

produce hemolytic anemia, hyperbilirubinemia, and kernicterus in the newborn - especially in premature infants - and is not recommended."

158.    Another study indicated that, while premature babies (before 34 weeks), may be at higher risk of bleeding in the brain than full-term babies, and thus would benefit from greater Vitamin K, there was no evidence that a Vitamin K injection to women immediately prior to the very preterm birth decreased the risk of hemorrhage in their babies.

159.    The effects of newborn Vitamin K injections on fertility and cancer risk have not yet been studied.

160.    Due to supply shortages, some hospitals have resorted to administering adult formulations of Vitamin K to newborns.    The adult formulation contains ingredients contraindicated for newborns.

161.    The package insert (https://www.accessdata.fda.gov/drugsatfda_ *docs/label/2003/012223Orig1s039Lbl.pdf*) of a popular Vitamin K shot states under the heading "ADVERSE REACTIONS":

> Deaths have occurred after intravenous and intramuscular administration. (See Box Warning.)  Transient 'flushing sensations' and 'peculiar' sensations of taste have been observed, as well as rare instances of dizziness, rapid and weak pulse, profuse sweating, brief hypotension, dyspnea, and cyanosis.  Pain, swelling, and tenderness at the injection site may occur.  The possibility of allergic sensitivity, including an anaphylactoid reaction, should be kept in mind.  Infrequently, usually after repeated injection, erythematous, indurated, pruritic plaques have occurred; rarely, these have progressed to scleroderma-like lesions that have persisted for long periods.  In other cases, these lesions have resembled erythema perstans.  Hyperbilirubinemia has been observed in the newborn following administration of phytonadione.  This has occurred rarely and primarily with doses above those recommended.

162.    Alternatives to the Vitamin K shot exist for newborns with risk factors or for whose mothers choose to supplement. For example, oral Vitamin K drops are used in Europe to prevent VKDB with great efficacy.

163.    Some mothers, uncertain of their own Vitamin K intake, concerned about the levels in their breastmilk, and who also refuse the Vitamin K shot, choose to supplement their breast milk with the oral form of Vitamin K via liquid drops during one of the baby's first feedings and periodically thereafter.

164.    Other parents who object to the Vitamin K shot reject the assumption that all newborns have a Vitamin K deficiency at birth or during the first months of life or, for that matter, at any time thereafter, that can only be resolved through an injection of Vitamin K.  These parents believe that Vitamin K can be absorbed by the infant through breast milk, formula bottle feedings, and/or oral Vitamin K supplementation.

165.    While UCMC pediatricians may disagree with the efficacy and risks of giving Vitamin K shots, these ultimately are classic decisions where parents – not doctors – must make these choices on behalf of their children.

## 2.    Illinois' Definition of "Medical Neglect" and "Temporary Protective Custody"

166.    DCFS has implemented DCFS Rule 300: Allegation 79, which defines "Medical Neglect" as follows:

> Lack of medical or dental treatment for a health problem or condition that, if untreated or not treated as prescribed, could become severe enough to constitute serious or long-term harm to the child; lack of follow through on a reasonable prescribed medical or dental treatment plan for a condition that could become serious enough to constitute serious or long-term harm to the child if the treatment or treatment plan goes unimplemented…. It must be verified that the child has/had an untreated health problem, or that a prescribed treatment plan was implemented. Such verification must come from a physician, registered nurse, dentist, or by a direct

admission from the alleged perpetrator. It must further be verified by a physician, registered nurse or dentist that the problem or condition, if untreated, could result in serious or long-term harm to the child.

167. Under DCFS's definition of "medical neglect," among other elements, it must be shown and verified that the specific child in question has a "health problem or condition . . .if untreated, could result in serious long-term harm to the child."

168. Illinois law allows for a child to be taken into "temporary protective custody," but only in extreme cases, based on the particular circumstances surrounding an individual case.

169. The Legislature defines "Temporary Protective Custody" as follows:

An officer of a local law enforcement agency, designated employee of [DCFS], or a physician treating a child may take or retain protective custody of the child without the consent of the person responsible for the child's welfare, if (1) he has reason to believe that the child cannot be cared for at home or in the custody of the person responsible for the child's welfare without endangering the child's health or safety; and (2) there is not time to apply for a court order under the Juvenile Court Act of 1987 [705 ILCS 405/1-1 et. seq. for temporary custody of the child. . . 325 ILCS 5/5.]

170. DCFS Rule 300.120 clarifies this definition to require that the child's caregiver "presents an imminent danger to the child's life or health."

171. Thus, any physician attempting to take or actually taking "temporary protective custody" of a child must show that he or she has "reason to believe that the child cannot be cared for at home or in the custody of the person responsible for the child's welfare without endangering the child's health or safety," *i.e*., that the caregiver presents an "imminent danger to the child's life or health," *and* lack of time to apply for a court order.

**F.     Color of Law**

172. As set forth above in Section I, Illinois law (325 ILCS 5/5) gives law enforcement officers, DCFS employees, and "a physician treating a child," the legal power to take a child into

31

protective custody, conferring upon physicians such as Dr. Liou the awesome power and authority of the State to take custody of children, something that is traditionally within the exclusive power of the State, alongside DCFS officials and law enforcement officers, both traditional state actors.

173. At the same time, however, this same statute also makes sure that these three types of actors only do so in an extremely limited and circumscribed manner, and only based on the individual circumstances of the case.

174. This statute authorizes such forced seizures and taking over of parental control but *only* where the "physician treating a child" (1) has reason to believe that the child cannot be cared for at home or in the custody of the person responsible for the child's welfare without endangering the child's health or safety; and (2) there is not time to apply for a court order under the Juvenile Court Act of 1987.

175. Drs. Yarbrough, Lysouvakon, Choing Claud, Shao, Taha and Glick volunteered and agreed to take on the power of the State in invoking the "protective custody" statute and their legal right to do so to the Plaintiffs and/or their implementation of UCMC policy on this subject, even though they knew or should have known they had no good-faith legal or medical basis to do so.

176. UCMC also volunteered to take on the power of the State and step in its stead when it adopted and implemented its *per se* "protective custody" policy so that it could make medical choices for parents simply because they disagreed with the choice of these parents to decline a Vitamin K shot for their babies.

177. UCMC, meanwhile, worked with high-ranking DCFS officials such as Dr. Jaudes and Dr. Glick, who both also are to be UCMC employees, and Harms-Pavelski and Walker, to

implement and adopt a UCMC "protective custody" statute so that UCMC could enforce its policy with the imprimatur of DCFS authority.

178. Dr. Glick also assumed numerous paid and unpaid positions that made her roles that allowed her to be fairly characterized as a state actor.

179. UCMC further made sure its policy was cloaked with this DCFS authority before its pediatricians started to use this policy on a widespread basis in attempt to avoid being sued for violating the constitutional rights of parents who refused Vitamin K shots for their babies.

180. UCMC also made sure to its policy was kept secret from the public, and it sought DCFS assistance to ensure that other hospitals would have the same sort of "protective custody" policies, based on Section H, so that parents would not be free to transfer hospitals once they were informed that they had no choice but to refuse the Vitamin K shots.

181. No reasonable "physician treating a child," could reasonably conclude that the mere refusal of prophylactic medical procedure such as the giving of a Vitamin K shot – in every case no matter the particular circumstances – would legally justify the threat or the actual taking into "protective custody" in every case of a Vitamin K refusal, and certainly not in the case involving the Scotts.

182. The statute also provides for state-law immunity for doctors who act in good faith, but here, even if such a defense existed under federal law, these defendants in any event did not act in good faith because no reasonable doctor could possibly conclude he or she would be legally justified in threatening to take a child into protective custody based on the mere refusal of an unnecessary and prophylactic Vitamin K shot for a healthy baby.

183. Moreover, Defendant UCMC was acting under color of law, and not acting in good faith, in implementing its express policy of allowing, encouraging and/or requiring its physicians

33

to take or threaten to take babies into protective custody based on these *per se* refusals, knowing that its policy would result in its physicians abusing the powers given to its physicians by state law by taking babies into "protective custody" without any legal basis of doing so, even though Defendant UCMC's physicians would be invoking the power of the state to do so, knowing that anyone who is not one of the three types of actors defined by the statute would not be allowed to even attempt to take such drastic action.

184.    UCMC, through its agents and/or employees, developed, adopted, and implemented its "temporary custody" policy in concert with high-ranking DCFS officials, and it did so to ensure that UCMC would be protected by the force of law provided by DCFS.   These DCFS officials knew that UCMC was using DCFS to justify an illegal "temporary custody" policy that specifically was illegal, both federally and under the Constitution, yet these DCFS officials continued to approve and/or condone UCMC's policy, including after Defendant Walker rescinded the policy, which rescinded the language defining the refusal of Vitamin K as per se medical neglect without rescinding the Note found in Section H.

### Count I:
### Substantive Due Process/Conspiracy to violate Substantive Due Process Rights/Supervisory Liability
### All Plaintiffs against all Defendants

185.    Each of the above paragraphs is incorporated here.

186.    A family has the right under the due process clause of the Fourteenth Amendment to the United States Constitution to remain together without the coercive interference of the awesome power of the State.  This right is the most basic aspect of family privacy.

187.    A parent has the right to decline unnecessary prophylactic medical procedures for his or her minor child, and has the right to be free from unsubstantiated threats of State intervention in the family.

34

188.    Defendants knew that Plaintiffs had a Constitutional right to be free from the intrusion of the State into the family.

189.    The medical procedures that the Plaintiffs declined on behalf of their newborn babies were medically unnecessary and purely prophylactic.

190.    Defendants knew that Plaintiffs had a Constitutional right to refuse such medical procedures.

191.    All of the Defendants acted under color of state law when taking the actions described in this Complaint.

192.    Additionally, Defendant UCMC is liable based on *respondeat superior* principles for the actions of its emplyoyees described in this complaint, as these actions were taken within the course and scope of her employment.

193.    Defendants continued to enforce these policies even after rescinding this policy, and Scott took no actions to make sure these coercive and illegal practices were discontinued, even though they were both aware that these practices continued even after the rescission of Section H, and that there was no legal or medical basis to continue its unwritten and de facto widespread policy and practice of continuing to investigation parents for "medical neglect" based solely on their refusal of Vitamin K and/or erythromycin eye ointment, nor was there a basis to threaten or actually take a baby into "protective custody" based solely on parents' medical choices to refuse these procedures.

194.    The proximate cause of the actions of the Defendants were damages to the Plaintiffs, including but not limited to emotional and physical damages.

### Count II:
### Fourth Amendment Illegal Seizure Claims/Conspiracy to Violate Fourth Amendment Rights/Supervisory Liability
### All Plaintiffs against All Defendants Except Dr. Glick

195. Each of the above paragraphs is incorporated herein.

196. A person has the right under the Fourth Amendment to the United States Constitution to be free from unlawful searches and seizures.

197. Defendants Drs. Taha and Lysouvakon violated the rights of the Johnson-Vivrette Plaintiffs when they without legal justification agreed to threaten to take Baby E into custody and/or would not allow them to leave the hospital unless they signed waivers.

198. Defendants Drs. Yarbrough, Choing Claud and Shao violated the rights of the Krysten family in, without lawful justification, formed an unlawful agreement to actually take Baby I into custody.

199. Defendant UCMC violated the Plaintiffs' rights because the above actions of Defendants Taha, Lyousavakon, Yarbrough, Choing Claud and Shao, and other UCMC medical staff, were done by employees acting within the scope and employment of UCMC, and also done pursuant to an express and/or defactor UCMC policy.

200. The DCFS Defendants violated the Plaintiffs' constitutional rights when the case workers entered the Plaintiffs' homes, in the case of the Krystyns, or threatened to do so, with the Johnson-Vivrete ramily, without a warrant, valid consent and absent exigent circumstances.

201. Caseworkers Dowdy and Rogers knew they were entering into their respective plaintiff's home or threatening to do so without their valid consent, a warrant, or exigent circumstances, yet they conducted the illegal search and seizure anyway.

202. Caseworkers Celestine and Rodgers, their supervisors, knew Dowdy and Rogers were doing so, and formed an agreement to do so, and/or turned a blind eye toward their actions.

36

203.    Defendant Smith knew so-called "home visits" were being conducted of every family based solely on their refusal of Vitamin K shots and/or erythromycin for their babies, and that this was occurring on a widespread basis pursuant to an express and/or de facto DCFS policy.

204.    Defendants Smith knew of this widespread policy and practice, had the ability and duty to stop it, yet they turned a blind eye toward this routine and systematic violation of parents' rights by DCFS employees, the proximate cause of which were the illegal searches and seizures of the homes described in this complaint.

205.    When these Defendants acted, they did so under color of law.

206.    Defendant's actions caused injury to Plaintiffs, including but not limited to a loss of their liberty and mental and emotional pain and suffering.

### Count III: Malicious Prosecution (Plaintiffs v. UCMC, Dowdy, Celestine, Rogers, Rodgers)

207.    The Plaintiff parents also bring claims of malicious prosecution against Defendant UCMC for the actions of their employees, acting within the course and scope of their employment, and against DCFS Caseworkers Dowdy, Celestine, Rogers, and Rodgers, for instituting indicating findings of child abuse against the Plaintiffs.

208.    These actions were taken with malice, and without probable cause.

209.    These indicated findings were voluntarily unfounded in a manner not inconsistent with the innocence of the Plaintiffs.

210.    As a result, the Plaintiffs suffered damages, described more fully above.

211.    Because these actions were taken with malice, the Plaintiffs seek punitive damages against the Defendants.

### Count IV: Battery (Plaintiffs v. UCMC)

212. The Krysten Plaintiffs also bring a claim of civil battery against Defendant UCMC for the actions of their employees, acting within the course and scope of their employment.

213. Baby I was subjected to forced, unnecessary, unwanted medical treatment on their baby, against the express wishes of his parents.

214. This caused the Plaintiffs harm, i.e pain and suffering to the baby, and emotional pain and suffering to the parents, knowing their baby was being given invasive shots and IV treatments against their express desire.

215. Because this was part of a express policy of UCMC and repeated practice, the Plaintiffs also seek punitive damages against UCMC.

## **CONCLUSION**

WHEREFORE, the Plaintiffs demand judgment against Defendants for compensatory and punitive damages, plus the costs of this action and attorneys' fees, and such other and additional relief as this Court deems equitable and just.

**PLAINTIFFS DEMAND TRIAL BY JURY.**

RESPECTFULLY SUBMITTED,

s/Richard Dvorak
An Attorney for the Plaintiffs

Richard Dvorak
DVORAK LAW OFFICES, LLC
6262 Kingery Highway, Suite 305
Willowbrook, Illinois 60527
630-568-3190 (phone)
richard.dvorak@civilrightsdefenders.com