**IN THE UNITED STATES DISTRICT COURT FOR THE**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| REGINA KRYSTYN and ROBERT KRYSTYN, individually and on behalf of their minor child, Baby I, TYEISHA JOHNSON and RICKY VIVRETE, individually and on behalf of their minor child, Baby E, | ) ) ) ) ) ) ) |
| Plaintiffs, | ) Case No. 22 C 5321 ) |
| v. | ) Judge Joan H. Lefkow ) |
| UNIVERSITY OF CHICAGO MEDICAL CENTER, an Illinois non-profit corporation, DR. ANDREA YARBROUGH, DR. POJ LYSOUVAKON, DR. ERIKA CHOING CLAUD, DR. YI SHAO, DR. JILL GLICK, DR. MOHAMED TAHA, sued in their individual capacities, ASHLEY DOWDY, CYNTHIA CELESTINE, DEBBIE ROGERS, RHONDA RODGERS, DFCS caseworkers, sued in their individual capacities, and MARC D SMITH, DFCS Director, sued in his individual capacity, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) |

## OPINION AND ORDER

Two sets of parents filed this civil rights case against the University of Chicago Medical Center (UCMC) and several physicians practicing at UCMC, alleging deprivation of substantive due process based on the physicians' seizure, or threatened seizure, of their newborns for the purpose of administering certain medications according to UCMC policy. All defendants have moved to dismiss plaintiffs' complaint for failure to state a claim upon which relief may be granted. For the reasons stated below, the motion is granted without prejudice to repleading.

## BACKGROUND

Baby I was born at UCMC to parents Regina and Robert Krystyn (the Krystyns) on October 5, 2020. (Dkt. 1 ¶¶ 24, 42.) Baby E was born at UCMC to parents Tyeisha Johnson and Ricky Vivrete (the Johnson-Vivretes) on December 24, 2020. (*Id.* ¶ 25.) Before delving into the allegations explaining the details of their births and the subsequent investigations by the Illinois Department of Children and Family Services (DCFS) into their parents' actions, the court lays out relevant background information about UCMC and DCFS policies.

## I.     DCFS and UCMC Policy Background

In 2015, DCFS established Section H, an express, written policy of investigating parents who refused the administration of a Vitamin K shot or an antibiotic eye ointment to their newborn babies. (Dkt. 1 ¶¶ 105–06.) Section H directed all DCFS staff to consider these measures to be "medically necessary" and to investigate reports of parental refusal for "medical neglect":

> For purposes of child protection services, the administration of silver nitrate[1] or ophthalmic solution and Vitamin K shots or pills to newborns is considered medically necessary. Calls received at SCR[2] concerning a parent or guardian denying consent for the administration of these treatments shall be taken as reports of medical neglect.
>
> If a physician notifies SCR that temporary protective custody has been taken because the parent/caregiver's religious beliefs do not permit them to consent to necessary medical car[e], such information must be transmitted by the physician to the local State's Attorney's Office. No investigation will be taken unless there is additional information supporting other allegations of abuse or neglect.

*Id.* (citing DCFS Procedures 300, Appendix B, Allegation of Harm #79(b)(2), Section H).

_____

[1] "Silver nitrate" refers to eye drops. (Dkt. 1 ¶ 142.)

[2] SCR refers to the State Central Registry, the intake department at DCFS. (Dkt. 1 ¶ 106 n.1.)

When this internal DCFS policy became known to Illinois pediatricians, it caused some confusion (dkt. 1 ¶ 108), so in early 2017 some members of the Perinatal Advisory Committee of the Illinois Department of Public Health (PAC), along with other Illinois pediatricians, sought further explanations and discussions with DCFS (*id.* ¶ 109). In June 2017, then-DCFS Deputy Director of Child Protection Nora Harms-Pavelski and then-DCFS Medical Director Dr. Paula Jaudes (who was also a member of the board of the Illinois Chapter of the American Academy of Pediatrician's Committee on Child Abuse and Neglect (COCAN) and a professor of pediatrics at UCMC) attended a meeting with PAC members. (*Id.* ¶¶ 112–13.) At the PAC meeting, Harms-Pavelski and Dr. Jaudes "told the PAC members that, after consulting with DCFS's legal department and the DCFS administration, … DCFS had decided that a Vitamin K shot refusal was *not* to be considered *per se* medical neglect[.]" (*Id.* ¶ 114.) Nor was it to be considered as mandating a call to DCFS. (*Id.*) Furthermore, "if doctors and medical staff were to make a call to DCFS based solely on a parent[al] refusal of" Vitamin K treatment, "then there would be no DCFS investigation conducted." (*Id.*)

Some high-ranking DCFS officials, as well as Dr. Jill Glick, a UCMC pediatrician who also served on the DCFS Advisory Board,[3] and other pediatricians, worked to reverse the decision made by Harms-Pavelski and Dr. Jaudes. (Dkt. 1 ¶ 115.) In other words, they believed that Section H should be enforced "so that a parent's refusal of a Vitamin K shot or the application of [antibiotic] eye ointment would be taken as a report of *per se* 'medical neglect' in every case and investigated by DCFS as such." (*Id.*) At an August 9, 2017 COCAN meeting, Dr.

---

[3] In addition to working at UCMC as a pediatrician and serving on the DCFS Advisory Board, Dr. Glick served as the medical director of UCMC's Child Advocacy and Protective Services and as the medical director of MPEEC (dkt. 1 ¶¶ 68–69), an organization that plaintiffs have not identified in their complaint or memorandum, but which the court takes judicial notice to be "the Multidisciplinary Pediatric Education and Evaluation Consortium," which is "a DCFS-funded consortium of pediatricians who specialize in child abuse." *Hernandez ex rel Hernandez* v. *Foster*, 657 F.3d 463, 471 (7th Cir. 2011).

Glick and other pediatricians "encouraged Dr. Jaudes to convince DCFS to reverse course and make Section H the official policy of DCFS," meaning that physicians would be authorized to take "babies into protective custody to forcibly administer the Vitamin K shot." (*Id.* ¶¶ 117, 120.) After that meeting, Dr. Glick and other UCMC pediatricians worked to develop UCMC's own "protective custody" policy. (*Id.* ¶ 122.) In an email dated August 10, 2017, Dr. Glick explained to Harms-Pavelski and Dr. Jaudes that the impetus for a UCMC policy was "DCFS recognizing [Vitamin K refusal] as child medical neglect." (*Id.* ¶ 123.) In October 2017, Harms-Pavelski and other DCFS officials sent an email to pediatricians and hospitals stating that Section H would again be enforced and "asking all hospitals to report refusal of Vitamin K as medical neglect." (*Id.* ¶¶ 124–25.) The hospitals agreed to do so. (*Id.* ¶ 126.) In November 2017, Section H was officially adopted as DCFS policy. (*Id.* ¶ 128.)

Simultaneously, UCMC created its own "protective custody" policy relating to the administration of Vitamin K shots. (Dkt. 1 ¶ 133.) According to the complaint, "UCMC was confident that it could enforce its 'protective custody' policy because it made sure that it had the official approval [of] DCFS." (*Id.* ¶ 135.) At an April 2018 PAC meeting, a UCMC pediatrician who was also a PAC board member "explained that uniformity in Vitamin K policies, as well as secrecy, among hospitals was required because the pediatricians did not want patients to be able to transfer hospitals once they found out that their babies would be taken into protective custody for refusing Vitamin K shots." (*Id.*) The UCMC pediatrician assured other pediatricians at the meeting that they could not be sued for taking protective custody and ordering the administration of Vitamin K "because … you took protective custody. That's the part … that we have to assure with DCFS. That when we do this … DCFS has to say, 'This is our protocol, no matter what else we do: You are protected.'" (*Id.*) Whether DCFS followed up with an investigation was

irrelevant to the UCMC pediatrician: "You give the Vitamin K and then do any of us really care what happens next?" (*Id.*)

In June and July 2018, a group of parents confronted PAC members and DCFS about Section H and its enforcement. (Dkt. 1 ¶ 141.) On July 23, 2018, Bruce Dubre, an official with DCFS's Office of Children and Family Policy, sent an email to a Rules Analyst for the Illinois General Assembly's Joint Committee on Administrative Rules in which he stated that DCFS had "issued an Action Transmittal immediately revoking the Department's policy of using a parent's failure to approve of either [Vitamin K or antibiotic] treatment as a basis for an allegation of medical neglect." (*Id.* ¶ 142.) On August 2, 2018, then-DCFS Director Walker sent a letter to "DCFS staff and stakeholders" stating that, "effective immediately, DCFS would no longer consider the refusal by parents or guardians to allow doctors to administer Vitamin K shots or [antibiotic] eye ointment to newborn babies to be *per se* medical neglect." (*Id.* ¶ 143.)

Despite DCFS's recision of Section H, the complaint alleges that "*per se* medical neglect reporting to DCFS for refusal of newborn medical procedures continued … in a systematic manner, transitioning from an express, written policy to a *de facto*, unwritten one[.]" (Dkt. 1 ¶¶ 15, 145.) In other words, not only were medical staff reporting to DCFS, but "DCFS was enforcing the former Section H as an unwritten policy and widespread practice[.]" (*Id.* ¶ 149.) And, in any event, UCMC continued to enforce its own "protective custody" policy developed while Section H had officially been in effect at DCFS. (*Id.* ¶ 146.)

## II.     The Krystyns' Experience

When the Krystyns arrived at UCMC on or about October 5, 2020, they "provided medical staff with a written birth plan, which indicated [that] they wanted a natural birth, without, for example, the administration of a Vitamin K shot or any antibiotics." (Dkt. 1 ¶¶ 44,

46.) The Krystyns based their decision to refuse these treatments on their own "medical research" and conversations "with medical professionals, such as doulas and midwives, who confirmed that Vitamin K shots … and antibiotics at birth are medically unnecessary, purely prophylactic, and can carry some medical risks for babies." (*Id.* ¶ 45.) UCMC medical staff "pushed back" and "tried to convince" the Krystyns to allow these treatments, but the Krystyns reiterated that they wanted neither the Vitamin K shot nor the antibiotics for their baby. (*Id.* ¶ 47.)

As labor progressed, UCMC medical staff, including Drs. Andrea Yarbrough and Erika Choing Claud, told Mr. Krystyn that, "per UCMC policy, the refusals of Vitamin K and antibiotics would result in calling DCFS, taking their baby into protective custody, and administering the Vitamin K shot and antibiotics against their will." (Dkt. 1 ¶ 48.) To prevent this from happening, Mr. Krystyn called 911 (before his wife had given birth), but the UCMC police "sided with the UCMC medical personnel" and refused to intervene. (*Id.* ¶ 49.) Some time later, while Mrs. Krystyn was still in labor, UCMC medical staff, including Drs. Yarbrough, Choing Claud, and Yi Shao, made the decision to take protective custody of the Krystyns' baby. (*Id.* ¶¶ 50–51.) Mr. Krystyn again called 911 and asked the Chicago police to intervene. (*Id.* ¶ 52.) By the time the Chicago police arrived, however, Baby I had been born,[4] UCMC had taken protective custody of the infant, and UCMC medical staff had administered the Vitamin K and antibiotic treatments. (*Id.* ¶¶ 51–52.) UCMC retained protective custody of the child for 48 hours. (*Id.* ¶ 53.)

While the Krystyns were still at the hospital, DCFS caseworker Ashley Dowdy arrived and interviewed them. (Dkt. 1 ¶ 57.) The couple explained to Dowdy "that it was their informed

---

[4] The Krystyns' son was born prematurely at 34 weeks and 4 days with "some respiratory issues[.]" (Dkt. 1 ¶ 43.)

choice to decline a Vitamin K shot and antibiotics … and that at no time did any medical staff inform them that those treatments were life-saving measures" rather than purely "recommended treatments" that were "prophylactic in nature." (*Id.* ¶ 58.) They assured Dowdy that, "had they been told or believed that these medical treatments were life-saving," they would, "of course, … not have refused" the treatments. (*Id.* ¶ 60.) Dowdy told the couple that there would be a DCFS investigation and that a "home visit" would be required as part of that investigation. (*Id.* ¶¶ 62– 63.)

On October 8, 2020, Dowdy spoke with Dr. Shao. (Dkt. 1 ¶ 64.) Dowdy "grilled" Dr. Shao "about any specific medical condition that" the Krystyns' baby "had that would have necessitated immediate[], life-saving treatment[.]" (*Id.*) Dr. Shao could point to no such condition, telling Dowdy that "the Vitamin K shot and antibiotics were [UCMC's] 'standard' recommended treatment. (*Id.*) Dowdy asked whether Dr. Shao believed that the Krystyns were "guilty of medical neglect[.]" (*Id.* ¶ 65.) Dr. Shao said "yes." (*Id.*)

The following day, per DCFS protocol to consult with a doctor affiliated with MPEEC, Dowdy exchanged emails with Dr. Glick. (Dkt. 1 ¶¶ 66–67.) In an email dated October 9, 2020, Dr. Glick responded to an inquiry from Dowdy asking whether the facts of the Krystyns' case rose to the level of medical neglect. (*Id.* ¶ 73.) Dr. Glick opined that:

> [R]efusal by parent is not in the best interest of the child and no treatment would be medical malpractice. Hence the doctor was obligated to treat a sick premature baby. This baby was premature with respiratory distress and antibiotic treatment and Vitamin K are absolutely indicated. Premature babies who are ill or if the NICU MD … state[s] antibiotics are warranted and the risk of bleeding is higher in premies [*sic*] both medications are not under the category of choice by parents.

(*Id.* ¶ 73.) About a week later, on October 17, 2020, Dr. Glick talked by phone with DCFS caseworker Cynthia Celestine, who documented their conversation. (*Id.* ¶ 74.) Dr. Glick said that "in her opinion" the refusal to administer the Vitamin K and antibiotic treatments should be

"considered 'medical neglect' because if the two medications were not administered 'the child may have died' and … this would have resulted in a medical malpractice lawsuit." (*Id.*)

On November 23, 2020,[5] Dowdy conducted a mandatory "home visit" at the Krystyns' home. (Dkt. 1 ¶ 76.) During that visit, Dowdy "indicated to the [Krystyns] that both she and her supervisor, apparently referencing Cynthia Celestine, did not want to make [a medical neglect] finding, but that DCFS felt pressured by the medical doctors [Dowdy] was consulting to make the finding." (*Id.* ¶ 79.) Apparently "succumbing to the pressures" exerted by Drs. Shao and Glick, Dowdy and Celestine indicated the Krystyns for medical neglect. (*Id.* ¶ 80.) Dowdy apologized to the Krystyns and advised the couple that they should appeal the decision. (*Id.* ¶ 81.)

The Krystyns hired an attorney to appeal DCFS's finding. (Dkt. 1 ¶ 82.) In July 2021, that attorney wrote a letter to DCFS's senior litigation attorneys challenging DCFS's finding of medical neglect. (*Id.* ¶ 83.) At some point thereafter, DCFS voluntarily "unfounded" the finding. (*Id.* ¶ 6.)

### III.   The Johnson-Vivretes' Experience

Baby E, Tyeisha Johnson and Ricky Vivrete's daughter, was born at UCMC on December 24, 2020. (Dkt. 1 ¶¶ 85–86.) Shortly after the birth, Dr. Poj Lysouvakon and other medical personnel visited the Johnson-Vivrete's hospital room and "tried to convince the couple to have a Vitamin K shot for their baby." (*Id.* ¶ 87.) For religious reasons, the couple refused to allow the administration of a Vitamin K shot. (*Id.* ¶¶ 88–89.)

After again attempting (unsuccessfully) to convince the Johnson-Vivretes to accept the Vitamin K shot, UCMC medical staff asked the couple to sign a medical waiver reflecting their

---

[5] Plaintiffs' complaint states that this "home visit" took place on November 23, 2014. (Dkt. 1 ¶ 76.) The court reads this as a "typo" and infers that the visit took place in November 2020.

Case: 1:22-cv-05321 Document #: 88 Filed: 11/27/23 Page 9 of 25 PageID #:331

refusal. (Dkt. 1 ¶ 90.) The couple "had issues with the language" of the waiver, so they refused to sign. (*Id.* ¶ 91.) UCMC medical staff, including Dr. Lysouvakon, then "threatened" the couple that if they did not sign the waiver, "DCFS would come to the hospital and take custody of their baby," and even if the couple signed the waiver, there would still be an investigation. (*Id.* ¶ 92.) Regardless, Dr. Mohamed Taha told the couple, they would not be allowed to leave the hospital with their baby if they did not sign the waiver. (*Id.* ¶ 93.) The Johnson-Vivretes signed the waiver and left with their baby. (*Id.* ¶ 94.)

A DCFS investigation followed. (Dkt. 1 ¶¶ 95–103.) As part of that investigation, DCFS caseworker Debbie Rogers spoke with UCMC doctors, including Dr. Glick.[6] (*Id.* ¶¶ 95–96.) According to the complaint, both Rogers and her supervisor, Rhonda Rodgers, "repeatedly harassed, bullied, and threatened" the Johnson-Vivretes to allow a DCFS caseworker to conduct a mandatory home visit. (*Id.* ¶ 97.) If the couple did not consent to a home visit, Rogers and Rodgers suggested, the couple would be indicated for child abuse, and—Rodgers told the couple—DCFS and law enforcement would forcibly take their child. (*Id.* ¶ 98.) The couple offered to allow a DCFS caseworker to see their child over Zoom, but DCFS rejected this proposal, insisting that, at the very least, the couple would need to take the baby to a DCFS facility for observation. (*Id.* ¶ 99.) Because it was February 2021, in the middle of the COVID-19 pandemic, the couple refused. (*Id.* ¶ 100.) Shortly thereafter, DCFS indicated the Johnson-Vivretes for medical neglect based on their refusal of a home visit. (*Id.* ¶ 101.) On September 28, 2021, after the couple's attorney challenged this finding, DCFS voluntarily unfounded the finding of medical neglect. (*Id.* ¶¶ 102–03.)

---

[6] The complaint does not provide any details relating to these conversations. (Dkt. 1 ¶¶ 95–96.)

IV.     **This Lawsuit**

Invoking 42 U.S.C. §§ 1983 and 1988, plaintiffs initiated this action in federal court in September 2022, alleging violations of substantive due process and conspiracy to violate substantive due process (Count I), unconstitutional seizure and conspiracy to violate the Fourth Amendment (Count II), malicious prosecution (Count III), and battery (Count IV).[7] (Dkt. 1 ¶¶ 22, 185–215.) Plaintiffs seek compensatory and punitive damages, as well as costs and attorneys' fees.[8] (*Id.* at 38.)

In their motion to dismiss, UCMC and the UCMC physicians (UCMC defendants) contend that plaintiffs cannot bring their constitutional claims against them because the UCMC defendants are private actors, not state actors, and are therefore not bound by the Fourth or Fourteenth Amendments and cannot be subjected to suit under 42 U.S.C. § 1983. (*Id.* at 5.) Moreover, to the extent that plaintiffs seek to impute state action to the UCMC defendants, the UCMC defendants contend that the complaint fails to support any recognized theory of imputation. (*Id.* at 5–10.) Even if the UCMC defendants could be viewed as acting under color of state law, they argue, plaintiffs have failed plausibly to allege violations of their constitutional rights. (*Id.* at 10.) Furthermore, even if plaintiffs' constitutional rights were violated, the UCMC defendants would be entitled to qualified immunity. (*Id.* at 12.) Regardless, plaintiffs cannot hold UCMC liable for the actions of its doctors under a theory of respondeat superior as Section 1983 does not permit vicarious liability. (*Id.* at 11.) The UCMC defendants also argue that plaintiffs'

---

[7] Plaintiffs bring Count I against all defendants, Count II against all defendants except Dr. Glick, Count III against UCMC and all DCFS caseworkers (defendants Dowdy, Celestine, Rogers, and Rodgers), and Count IV against UCMC only. (Dkt. 1 ¶¶ 185–215.)

[8] As Counts I and II arise under the Constitution of the United States, this court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a). The court's supplemental jurisdiction allows it to consider plaintiffs' state law claims (Counts III and IV). *See* 28 U.S.C. § 1367(a).

state law claims must be dismissed because UCMC is immune from such claims under Illinois law and plaintiffs' malicious prosecution claim fails as a matter of law. (*Id.* at 13–14.)

## **LEGAL STANDARD**

A Rule 12(b)(6) motion to dismiss tests the sufficiency of a complaint to state a claim upon which relief may be granted. *See McReynolds* v. *Merrill Lynch & Co., Inc.*, 694 F.3d 873, 879 n.4 (2012). To withstand such a challenge, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. A "well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable[.]" *Twombly*, 550 U.S. at 556. When ruling on a 12(b)(6) motion, the court accepts as true all well-pleaded facts in the complaint and draws all reasonable inferences in the plaintiff's favor. *See Hughes* v. *Northwestern Univ.*, 63 F.4th 615, 630 (7th Cir. 2023). A complaint "need not allege each evidentiary element of a legal theory to survive a motion to dismiss." *Freeman* v. *Metro. Water Reclamation Dist. of Greater Chi.*, 927 F.3d 961, 965 (7th Cir. 2019) (citing *Swierkiewicz* v. *Sorema, N.A.*, 534 U.S. 506, 510–14 (2002)). But neither legal conclusions masquerading as factual allegations, *see Papasan* v. *Allain*, 478 U.S. 265, 286 (1986), nor "a formulaic recitation of the elements" of a claim, *Twombly*, 550 U.S. at 555, will suffice under Federal Rule of Civil Procedure 8(a)(2) ("A pleading that states a claim for relief must contain … a short and plain statement of the claim showing that the pleader is entitled to relief[.]").

## ANALYSIS

### I.      State Action

Section 1983 "creates liability for any person who, acting under color of state law, deprives" another of their constitutional or federal statutory rights. *Biggs* v. *Chi. Bd. of Educ.*, 82 F.4th 554, 559 (7th Cir. 2023). Liability is not limited to "persons" in a literal sense but extends to entities acting under color of state law. *See*, *e.g.*, *Monell* v. *Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 688–89 (1978) (holding that "local government bodies … [are] included within the ambit of the persons who could be sued" under the Civil Rights Act). Thus, *anyone*, whether an individual or an organization, whose conduct is "fairly attributable to the State" can be sued as a state actor under Section 1983. *Lugar* v. *Edmondson Oil Co.*, 457 U.S. 922, 937 (1982). Although the alleged state actor is usually an officer, employee, or component of state government, "on some occasions, the acts of a private party are fairly attributable to the state because the party has acted in concert with state actors." *Rodriguez* v. *Plymouth Ambulance Serv.*, 577 F.3d 816, 823 (7th Cir. 2009).

Where, as here, the State's involvement is uncertain, courts must focus on facts: "Only by sifting facts and weighing circumstances can the nonobvious involvement of the State in private conduct be attributed its true significance[.]" *Lugar*, 457 U.S. at 939 (quoting *Burton* v. *Wilmington Parking Auth.*, 365 U.S. 715, 722 (1961)).[9] The Supreme Court has developed several tests to aid courts in conducting this "necessarily fact-bound inquiry[,]" *id.*, including (1) "the symbiotic relationship test," (2) "the state command and encouragement test," (3) "the joint

---

[9] Plaintiffs' memorandum in opposition to the motion to dismiss incorrectly attributes to the Supreme Court the statement that the question of state action is a "highly fact specific inquiry that is not susceptible to an easy, formulaic analysis." (Dkt. 61 at 9.) Contrary to plaintiffs' representation, this statement does not come from the Court's opinion in *Lugar*. It comes, rather, from an opinion of this district court, *Coles* v. *City of Chi.*, 361 F. Supp. 2d 740, 747 (N.D. Ill. 2005). Plaintiffs' counsel needs to exercise greater care in representing law to this court.

participation doctrine," and (4) "the public function test." *Listecki* v. *Official Comm. of Unsecured Creditors*, 780 F.3d 731, 738 (7th Cir. 2015) (quoting *Rodriguez*, 577 F.3d at 823–24). It should be recognized that these tests, as formulated, "are susceptible to semantic variations, conflations and significant overlap in practical application[.]" *Rodriguez*, 577 F.3d at 823. Their common focus, however, is whether there exists "such a 'close nexus between the State and the challenged action' that the challenged action 'may be fairly treated as that of the State itself.'" *Id.* (quoting *Jackson* v. *Metro. Edison Co.*, 419 U.S. 345, 351 (1974)). Plaintiffs contend that there are sufficient allegations in the complaint to make it plausible that the UCMC defendants qualify as state actors under three of these tests. (Dkt. 61 at 9–12.)

It is not entirely clear from plaintiffs' complaint and briefing whether plaintiffs seek to ascribe state action only to UCMC as an organization or to both UCMC and its individual physicians. The complaint asserts, in conclusory fashion, that each of the individual UCMC defendants acted under color of state law when they took the challenged actions (dkt. 1 ¶¶ 27–33) and that UCMC acted under color of state law when it implemented its Vitamin K and protective custody policy (*id.* ¶ 34).[10] But the complaint makes absolutely no allegations that might show state action on the parts of Drs. Yarbrough, Choing Claud, Shao, Taha, and Lysouvakon. Drs. Yarbrough and Choing Claud merely told the Krystyns that "refusals of Vitamin K and antibiotics would result in calling DCFS, taking their baby into protective custody, and administering the Vitamin K shot and the antibiotics against their will." (*Id.* ¶ 48.) Dr. Shao was simply present when these statements were made. (*Id.* ¶ 51.) And Drs. Taha and Lysouvakon merely "tried to convince" the Johnson-Vivretes to accept a Vitamin K shot and

_____

[10] Illinois law allows "a physician treating a child [to] take or retain temporary protective custody of the child without the consent of the person responsible for the child's welfare" under circumstances specified by statute. 325 Ill. Comp. Stat. 5/5 ("Temporary protective custody").

asked "the couple [to] sign a medical waiver reflecting their refusal." (*Id.* ¶¶ 87, 90.) When the couple refused to sign the waiver, Dr. Lysouvakon told them that there would be a DCFS investigation and DCFS would take custody of their baby, and Dr. Taha told them that they could not leave the hospital until they signed the waiver. (*Id.* ¶¶ 92–93.) Simply threatening to call DCFS is not nearly enough to show state action.

Moreover, plaintiffs make no argument in their briefing on the motion to dismiss that any of these physicians engaged in state action. (*See* Dkt. 61.) Plaintiffs focus, rather, solely on UCMC and Dr. Glick. (*Id.* at 10, 12.) As the following analysis shows, however, the complaint does not provide sufficient factual allegations to find that either UCMC or Dr. Glick acted under color of state law.

### A. The Symbiotic Relationship Test

A symbiotic relationship exists between a private party and the State where "[t]he nominally private character of the [private party] is overborne by the pervasive entwinement of public institutions and public officials in its composition and workings," such that "there is no substantial reason to claim unfairness in applying constitutional standards" to the private party. *Brentwood Acad.* v. *Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 298 (2001).

Plaintiffs argue that UCMC and DCFS "were so co-mingled in their responsibilities that they [are] indistinguishable[.]" (Dkt. 61 at 12.) But in support of this broad assertion, plaintiffs point only to "Dr. Glick's involvement in the Krystyn investigation." (*Id.*) According to plaintiffs, when Dr. Glick "performed her actions, she served as a UCMC pediatrician, was instrumental in getting Section H passed to give cover for a similar UCMC policy," served in "an advisory role with DCFS, and … acted in a consulting role with MPEEC as to whether the refusal of Vitamin K at UCMC was medical neglect[.]" (*Id.*) As the court understands this

argument, plaintiffs contend that the complaint plausibly alleges a symbiotic relationship between UCMC and the State because a single UCMC pediatrician advocated for the passage of Section H and took on advisory and consulting roles with DCFS and MPEEC, respectively. The most that can be inferred from these facts is that Dr. Glick wanted DCFS to adopt and enforce Section H because it would provide legal cover for the pediatricians and the hospital if they were sued. This does not approach the type of "pervasive entwinement" between DCFS and UCMS as described in, for example, *Brentwood Academy*, where the defendant athletic association was "an organization of public schools represented by their officials acting in their official capacity to provide an integral element of secondary public schooling." 531 U.S. at 299–300. As the Court put it, "There would be no recognizable Association, legal or tangible, without the public school officials," and those officials did "not merely control but overwhelmingly perform[ed] all but the purely ministerial acts by which" the association existed and functioned. *Id.* at 300. The factual allegations here, however, show no such symbiotic relationship, either between UCMC and DCFS as organizations or between Dr. Glick and DCFS or DCFS officials. In short, plaintiffs cannot show state action via the symbiotic relationship test.

### B. The Joint Participation Doctrine

The joint participation doctrine, also known as the "conspiracy theory" of Section 1983 liability, requires that a plaintiff plausibly allege "a *concerted effort* between a state actor" and the private party to deprive the plaintiff of her constitutional rights. *See Spiegel* v. *McClintic*, 916 F.3d 611, 616 (7th Cir. 2019) (quoting *Fries* v. *Helsper*, 146 F.3d 452, 457 (7th Cir. 1998)) (emphasis in original). Under this theory, the plaintiff must allege, and eventually prove, that (1) a state actor and a private party "reached an understanding to deprive the plaintiff of [her] constitutional rights," and (2) the private party was a "willful participant[] in joint activity with

15

the State or its agents." *Spiegel*, 916 F.3d at 616 (quoting *Fries*, 146 F.3d at 457). "[M]ere allegations of joint action or a conspiracy do not demonstrate that [the private party] acted under color of state law and are not sufficient to survive a motion to dismiss." *Id.* (quoting *Fries*, 146 F.3d at 458). Rather, an alleged joint action or conspiracy must "be supported by some factual allegations suggesting … a 'meeting of the minds.'" *Tarkowski* v. *Robert Bartlett Realty Co.*, 644 F.2d 1204, 1206 (7th Cir. 1980) (quoting *Sparkman* v. *McFarlin*, 601 F.2d 261, 268 (7th Cir. 1979) (en banc) (Sprecher, J., concurring)). Here, plaintiffs' complaint does not plausibly allege that either UCMC or the UCMC physicians ever "reached an understanding" with DCFS to deprive plaintiffs of their constitutional rights. *See Spiegel*, 916 F.3d at 616.

Plaintiffs argue first that there was "joint action" between UCMC and DCFS because they "joint[ly]" implemented "Section H and the UCMC policy," such that UCMC used "Section H as cover to seize babies and threaten the seizure of babies[.]" (Dkt. 61 at 10.) But aside from twice using the conclusional word "joint," plaintiffs present no factual allegations indicating that UCMC and DCFS had an understanding that Section H and the UCMC policy would operate in tandem as part of a "concerted effort" to seize their baby. *See Spiegel*, 916 F.3d at 616. *See also Holderman* v. *Walker*, No. 19 C 6324, 2021 WL 1192441, at *13 (N.D. Ill. Mar. 30, 2021) (finding allegations "that the private (Dr. Glick and UCMC) and state (DCFS) parties acted with a common goal by creating similar policies" insufficient to show joint action or conspiracy), appeal pending, No. 22-2108 (7th Cir.). This is to say nothing of the fact that DCFS had rescinded Section H more than two years before plaintiffs' children were born at UCMC. (Dkt. 1 ¶¶ 42, 85, 146.) In other words, even if UCMC and DCFS had, at one time, an agreement that could be inferred from their parallel policies, the factual allegations in the complaint indicate that UCMC and DCFS were no longer in agreement by the time plaintiffs suffered the alleged

constitutional violations. There can be "no 'meeting of the minds' where one party takes an action the other party has … expressly disavowed[.]" *Holderman*, 2021 WL 1192441, at *15.

Plaintiffs argue, however, that Dr. Glick's involvement in the Krystyns' case further supports their conspiracy theory. (Dkt. 61 at 10.) To plaintiffs, Dr. Glick's "tripartite" roles with DCFS, MPEEC, and UCMC and her "direct involvement in the Krystyn abuse investigation" are sufficient to show a conspiracy. (*Id.*) By participating in that investigation, Dr. Glick "conspired with the DCFS investigators to indicate the Krystyns for abuse." (*Id.*) Again, plaintiffs fail to support their conclusional language (e.g., "conspired") with factual allegations that would allow even a reasonable inference of an agreement between the UCMC defendants and DCFS. Plaintiffs do not allege that Dr. Glick was involved with the Johnson-Vivrete investigation, and they allege that Dr. Glick became involved in the Krystyn investigation *four days after it began*. (Dkt. 1 ¶¶ 42, 51–57, 66, 73.) When Dr. Glick finally became involved, it was purely to respond to DCFS's "inquiry whether the facts of [the Krystyn] case rose to the level of medical neglect." (*Id.* ¶¶ 73–74.) But "'the mere act of furnishing information to law enforcement officers' does not constitute joint activity … ." *Spiegel*, 916 F.3d at 617 (quoting *Butler* v. *Goldblatt Bros.*, 589 F.2d 323, 327 (7th Cir. 1978)).[11] The complaint's allegations are therefore insufficient to succeed on a joint-participation theory.

---

[11] Plaintiffs' citation to *Green* v. *Quick*, No. 16 C 863, 2017 WL 1509156 (S.D. Ill. Apr. 27, 2017), *aff'd*, 942 F.3d 772 (7th Cir. 2019), to suggest the contrary is not persuasive. To be sure, in *Green*, the court found that the plaintiff had plausibly alleged a conspiracy between a couple, a sheriff, and a county attorney, such that the private couple could be held to account under Section 1983. *Id.* at *2–3. But unlike the allegations here, the allegations in *Green* were not conclusional. There, the complaint alleged that the police officers "orchestrat[ed]" the plaintiff's arrest and the removal of her child "in an effort to give [a private couple] grounds to secure permanent custody" in ongoing custody proceedings. *Green* v. *Quick*, No. 16 C 863, 2017 WL 365368, at *1 (S.D. Ill. Jan. 25, 2017). The plaintiff supported these allegations with exhibits—a police report and a letter from a private investigator—that tended to support the allegations. *Id.* at *2. More critically, the challenge before the court in *Green* was not whether the complaint plausibly alleged state action by the private defendants, but whether the complaint had

### C. The Public Function Test

The public function test looks to whether a private entity exercises "powers traditionally exclusively reserved to the State." *Jackson*, 419 U.S. at 352 (collecting cases involving privately run elections, company towns, and municipal parks). *See also Manhattan Cmty. Access Corp.* v. *Halleck*, 587 U.S. ----, 139 S. Ct. 1921, 1926 (2019). "It is not enough that the federal, state, or local government exercised the function in the past, or still does. And it is not enough that the function serves the public good or the public interest in some way." *Manhattan Cmty. Access Corp.*, 139 S. Ct. at 1928–29. Rather, "a private entity is a governmental actor when it is performing an action that is 'traditionally the *exclusive* prerogative of the State.'" *Listecki*, 780 F.3d at 740 (quoting *Jackson*, 419 U.S. at 353) (emphasis added). The "test is rarely met." *Id.* (citing *Rodriguez*, 577 F.3d at 824 n.11).

Plaintiffs argue that the UCMC defendants are performing such a traditionally exclusive state function when they seize children for perceived medical neglect. (Dkt. 61 at 11.) But plaintiffs do not support this assertion—that the seizure of children is a traditional public function—with any historical evidence or case law, and the court will not strive to develop for them this perfunctory and unsupported argument.[12] *See Castelino* v. *Rose-Hulman Inst. of Tech.*, 999 F.3d 1031, 1036 (7th Cir. 2021) ("It is not the obligation of the court to research and

---

provided enough factual content to justify federal subject-matter jurisdiction. *Green*, 2017 WL 1509156, at *1–2. The defendants had, in fact, "ignore[ed]" briefing whether the plaintiffs "need[ed] to flesh out the conspiracy theory." *Id.* at *3.

[12] The one case plaintiffs cite—*Letisha A. by Murphy* v. *Morgan*, 855 F. Supp. 943 (N.D. Ill. 1994)—does not provide any support for plaintiff's assertion. The *Letisha A.* court observed that the defendants in that case did "not contest that the State of Illinois has historically acted on behalf of minors to protect their personal and property interests[,]" *id.* at 949, but the question of whether the "seizure of children" is a traditional and exclusive government function was simply not before the court.

construct the legal arguments open to parties, especially when they are represented by counsel.")
(quoting *Riley* v. *City of Kokomo*, 909 F.3d 182, 190 (7th Cir. 2018)) (cleaned up).

In sum, neither plaintiffs' complaint (dkt. 1) nor plaintiffs' memorandum in opposition to
the motion to dismiss (dkt. 61) provides any basis for the court to conclude that the UCMC
defendants acted "under color of state law[.]" *See Biggs*, 82 F.4th at 559. Since their conduct
cannot be "fairly attributable to the State[,]" *Lugar*, 457 U.S. at 937, the UCMC defendants
cannot be held liable for any alleged constitutional violations under Section 1983.

## II.    State Law Claims

### A.  Count III: Malicious Prosecution

Plaintiffs' complaint asserts a claim for malicious prosecution (Count III) against UCMC
and the DCFS defendants. (Dkt. 1 ¶¶ 207–11.) For purposes of this motion to dismiss, the only
question is whether the Krystyns have plausibly alleged a claim for malicious prosecution
*against UCMC*.[13]

In Illinois, to "state a cause of action for the tort of malicious prosecution, the plaintiff
must" allege, and eventually "prove five elements: '(1) the commencement or continuance of an
original criminal or civil judicial proceeding by the defendant; (2) the termination of the
proceeding in favor of the plaintiff; (3) the absence of probable cause for such proceeding; (4)
the presence of malice; and (5) damages resulting to the plaintiff.'" *Beaman* v. *Freesmeyer*, 131
N.E.3d 488, 495 (Ill. 2019) (quoting *Swick* v. *Liautaud*, 662 N.E.2d 1238, 1242 (Ill. 1996)).

---

[13] Although the complaint clearly states that both sets of parents bring the malicious prosecution
claim against both UCMC and the DCFS defendants, plaintiffs' memorandum in opposition to the motion
to dismiss "clarif[ies]" that the Johnson-Vivrete family asserts this claim against only the DCFS
defendants. (Dkt. 61 at 14 n.1.) Because a complaint cannot be amended by memorandum, *see Agnew* v.
*Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328, 348 (7th Cir. 2012), the court construes plaintiffs'
"clarification" as a waiver of the Johnson-Vivrete family's malicious prosecution claim against UCMC.
Any amended complaint should omit the Johnson-Vivrete family's claim of malicious prosecution.

"[L]iability for malicious prosecution [also] 'extends to all persons who played a significant role in causing the prosecution of the plaintiff, provided all of the elements of the tort are present.'" *Id.* at 499 (quoting *Frye* v. *O'Neill*, 520 N.E.2d 1233, 1240 (Ill. App. Ct. 1988)).

At the same time, Illinois law requires certain professionals "to report to DCFS when they have 'reasonable cause' to suspect child abuse or neglect." *Sebesta* v. *Davis*, 878 F.3d 226, 231 (7th Cir. 2017) (citing 325 Ill. Comp. Stat. 5/4). And Illinois's Abused and Neglected Child Reporting Act (ANCRA), 325 Ill. Comp. Stat. 5/1 *et seq.*, "provides civil and criminal immunity to persons who report their concerns to DCFS in good faith." *Sebesta*, 878 F.3d at 231 (citing 325 Ill. Comp. Stat. 5/9). If reporting is mandatory under ANCRA, "good faith is presumed." *Id.* (citing 325 Ill. Comp. Stat. 5/9). *See also Doe* v. *Winny*, 764 N.E.2d 143, 152–53 (Ill. App. Ct. 2002). As relevant here, medical personnel and health-care providers are required to report. 325 Ill. Comp. Stat. 5/4(a)(1), (10). While Illinois law does not define "good faith," it is clear that "an individual does not act with good faith" when she "acts with actual malice, violates the provisions of [ANCRA], or makes a report of abuse when there is no reasonable basis for such a report and the evidence suggests that the report was made for malicious purposes." *Doe*, 764 N.E.2d at 153. The reporter must have "acted maliciously, dishonestly, or for some improper purpose." *Id.* at 154.

UCMC argues that plaintiffs have not plausibly alleged facts supporting the elements of a malicious prosecution claim and, even if they had, that UCMC is entitled to immunity under ANCRA. (Dkt. 42 at 13–15.) Plaintiffs counter that they have met the tort's elements and that UCMC is not entitled to immunity because UCMC staff falsely reported medical neglect to DCFS. (Dkt. 61 at 13–15.)

In arguing that plaintiffs have failed plausibly to allege the elements of malicious prosecution, UCMC focuses entirely on the fact that none of the UCMC defendants commenced any proceedings against plaintiffs. (Dkt. 42 at 14–15.) While this may be true, UCMC's argument ignores the legal reality that UCMC could still be held liable by playing "a significant role in causing" the DCFS proceedings. *Frye*, 520 N.E.2d at 1240. The court need not decide, however, whether the complaint plausibly alleges that UCMC played such a "significant role" because UCMC is entitled to immunity under ANCRA.[14]

As medical personnel and health-care providers, UCMC staff are (and were) required to report "when they have reasonable cause to believe that a child known to them in their professional or official capacities may be … a neglected child" to DCFS.[15] *See* 325 Ill. Comp. Stat. 5/4(a)(1), (10). Because reporting is, for them, mandatory, their good faith is presumed. *Sebesta*, 878 F.3d at 231 (citing 325 Ill. Comp. Stat. 5/9). Plaintiffs could, of course, overcome that presumption with factual allegations from which it would be reasonable to infer an absence of good faith (e.g., actual malice, violations of ANCRA, or no reasonable basis), *see Doe*, 764 N.E.2d at 153, but plaintiffs' complaint comes up short.

The complaint alleges that Dr. Shao told DCFS caseworker Dowdy that the Krystyns' choice to decline a Vitamin K shot and antibiotics for their baby amounted to "medical neglect." (Dkt. 1 ¶ 65.) Dr. Glick echoed this in her October 9 email to Dowdy:

> "[R]efusal by parent is not in the best interest of the child and no treatment would be medical malpractice. Hence the doctor was obligated to treat a sick premature

---

[14] The court also need not decide whether a DCFS investigation qualifies as a proceeding for the purpose of a malicious prosecution claim.

[15] The complaint does not expressly allege that UCMC or any of the UCMC physicians contacted DCFS. Rather, the complaint alleges (1) that the Krystyns were told by two doctors that, "per UCMC policy, the refusals of Vitamin K and antibiotics would result in" reporting to DCFS (dkt. 1 ¶ 48) and (2) that DCFS caseworker Dowdy later arrived at the hospital (*id.* ¶ 57). The reasonable inference is that someone at UCMC contacted DCFS.

> baby. The baby was premature with respiratory distress and antibiotic treatment
> and Vitamin K are absolutely indicated.  Premature babies who are ill or if the
> NICU MD … state[s] antiobics are warranted and the risk of bleeding is higher
> in premies both medications are not under the category of choice by parents."

(*Id.* ¶ 73.) About a week later, Dr. Glick told DCFS caseworker Celestine that "in her opinion"

the Krystyns' refusal "was considered 'medical neglect' because if the two medications were not

administered 'the child may have died' and that this would have resulted in a medical

malpractice lawsuit." (*Id.* ¶ 74.) As plaintiffs see it, Doctors Shao and Glick cannot have acted in

good faith because they "falsely claimed" to DCFS that the Krystyns had "committed medical

neglect[.]" (Dkt. 61 at 13.)

To be sure, a false report may rebut the presumption that a medical professional acted in

good faith, particularly since false reporting violates ANCRA. *See Day* v. *Buckham*, No. 21 C

50022, 2021 WL 5050288, at *2 (N.D. Ill. Nov. 1, 2021) ("[A] false report is not made in good

faith, especially when the Reporting Act expressly provides that false reporting amounts to

disorderly conduct.") (citing 325 Ill. Comp. Stat. 5/4(m)). But plaintiffs do not point to any

*information* provided to DCFS by Doctors Shao or Glick—or anyone else at UCMC—that was

"false." The report that plaintiffs refused treatment was true, as was their report of taking

protective custody of the Krystyn baby. Rather, as plaintiffs themselves assert, telling DCFS that

the Krystyns' decision to refuse treatment could amount to "medical neglect" was only an

"opinion." (Dkt. 1 ¶¶ 74, 75.) It was a "legal conclusion" (*id.* ¶ 80), plaintiffs argue, that was not

the doctors' to make (*id.* ¶ 65).

This argument is incorrect as a matter of Illinois law. ANCRA *requires* doctors to report

suspected child neglect, which necessarily means that doctors must opine about whether the

parental conduct they observe could amount to neglect. *See* 325 Ill. Comp. Stat. 5/4(a)(1), (10).

That DCFS ultimately determined that the Krystyns had not committed "medical neglect" (*id.* ¶

83) does not mean that UCMC doctors lacked good faith in making their report. To conclude otherwise would undermine ANCRA's clear purpose of providing "immunity to persons who report *their concerns* to DCFS in good faith." *Sebesta*, 878 F.3d at 231 (citing 325 Ill. Comp. Stat. 5/9) (emphasis added).

Finally, contrary to plaintiffs' conclusional assertions that "the reports of medical neglect were unfounded, [were] not made in good faith, and were without legal or medical basis" (*id.* ¶ 6), neither Dr. Shao nor Dr. Glick wrote on a blank slate when they offered their opinions. According to the complaint, it is UCMC *policy* "to notify DCFS" when parents refuse a Vitamin K shot and to consider the parents' refusal to be "medical neglect." (*Id.* ¶ 2.) The UCMC physicians cannot have acted without a "reasonable basis" if UCMC required reporting.

In short, the complaint does not plausibly allege that UCMC staff acted with actual malice, violated ANCRA, or reported to DCFS with "no reasonable basis." *See Doe*, 764 N.E.2d at 153. Nor does the complaint allege any facts that might otherwise rebut the presumption of good faith. UCMC is therefore entitled to immunity with respect to the Krystyns' malicious prosecution claim.[16]

## B.  Count IV: Battery[17]

Under Illinois law, "battery is the unauthorized touching of the person of another." *Fiala* v. *Bickford Sr. Living Grp., LLC*, 43 N.E.3d 1234, 1240 (Ill. App. Ct. 2015). As framed by

---

[16] The complaint's failure to allege any facts indicating malice means that plaintiffs' malicious prosecution claim could very likely also be dismissed on the merits. *See Beaman*, 131 N.E.3d at 495 (requiring "the presence of malice" to make out a claim for malicious prosecution).

[17] Plaintiffs' complaint seems to bring Count IV by *all* plaintiffs against UCMC (dkt. 1 at 37), but the complaint then states that the Krystyns bring the claim (*id.* ¶ 212). As plaintiffs' memorandum in opposition to the motion to dismiss likewise argues only that the Krystyns suffered a battery (dkt. 61 at 15), the court construes the complaint as bringing Count IV by the Krystyns, and not the Johnson-Vivretes, against UCMC.

plaintiffs, the alleged battery here occurred when the Krystyns' baby "was subjected to forced, unnecessary, [and] unwanted medical treatment … against the express wishes of his parents. (Dkt. 1 ¶ 213.)

The court declines to decide at this time whether UCMC's motion to dismiss the battery claim should be granted because the court concludes that, having dismissed all federal claims against the UCMC defendants, it lacks subject-matter jurisdiction over the battery claim unless supplemental jurisdiction is authorized. 28 U.S.C. § 1367(a). Federal statute grants the court "supplemental jurisdiction over all other claims that are so related to claims in the action within [the court's] original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." *Id*. Furthermore, Section 1367(a) expressly provides that "supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties." Broadly speaking, a plaintiff may bring a federal claim against one defendant and simultaneously bring a state law claim against another defendant. But the claims must be "so related … that they form part of the same case or controversy … ." *Id.* To be sufficiently related, the claims must "derive from a common nucleus of operative fact." *Home Depot U.S.A., Inc.* v. *Jackson*, 587 U.S. ----, 139 S. Ct. 1743, 1753 n.1 (2019) (quoting *United Mine Workers of Am.* v. *Gibbs*, 383 U.S. 715, 725 (1966)). *See also Ammerman* v. *Sween*, 54 F.3d 423, 424 (7th Cir. 1995).

Here, plaintiffs maintain live constitutional claims against the DCFS defendants that afford this court original jurisdiction over the case under 28 U.S.C. § 1343, and Section 1367(a) allows plaintiffs to simultaneously bring state law claims against separate defendant UCMC. It is not clear, however, that the battery claim is "so related" to plaintiffs' constitutional claims against DCFS that these claims all "form part of the same case or controversy."

24

The alleged battery occurred when UCMC staff administered the Vitamin K and antibiotic treatments to the Krystyns' newborn. (Dkt. 1 ¶¶ 51–52, 213.) It appears from the complaint, however, that plaintiffs' constitutional claims against DCFS arise from actions DCFS took after (often well after) UCMC administered those treatments (i.e., investigating the plaintiffs for medical neglect in violation of substantive due process, entering the Krystyns' home in violation of the Fourth Amendment). (Dkt. 1 ¶¶ 186, 188, 190, 193, 200–04.) In other words, although the battery claim and constitutional claims have some connection in that the Krystyns' refusal of Vitamin K and antibiotic treatments for their baby set in motion the events that led to these claims, adjudication of the claims requires consideration of different acts by different people at different times with little overlap between the two sets of circumstances. The court therefore cannot discern a "common nucleus of operative fact" among these claims upon which supplemental jurisdiction may hang its hat. Accordingly, the court must dismiss the battery claim for want of jurisdiction. *See* Fed. R. Civ. P. 12(h)(3).

## CONCLUSION AND ORDER

For the foregoing reasons, the UCMC defendants' motion to dismiss (dkt. 42) is granted. Counts I, II, and III are dismissed for failure to state a claim and Count IV is dismissed for lack of jurisdiction; all are dismissed without prejudice. Plaintiffs are granted leave to replead and have until December 18, 2023 to file an amended complaint, if they believe the deficiencies addressed here can be overcome. This order has no effect on plaintiffs' claims against any of the DCFS defendants.

Date: November 27, 2023

_____
U.S. District Judge Joan H. Lefkow